390 A.2d 920.

IN RE JOHN DOE.

AUGUST 17, 1978.

PRESENT: Bevilacqua, C.J., Joslin, Kelleher, Doris and Weisberger, JJ.

KELLEHER, J. The respondent[1] is a juvenile who was tried by a justice of the Family Court for the murder of one Ricardo Jose. Hereafter we will refer to the respondent as "John." On January 19, 1976, he was found guilty of second-degree murder and accordingly adjudged a delinquent. This appeal from the finding of guilt and delinquency followed.

In the early hours of July 11, 1975, John, who was then 17 years old, struck and killed Ricardo Jose with a baseball bat in the backyard of a tenement house located at 212 Hanover Street in Providence, Rhode Island. Both John and Ricardo lived in the tenement house, Ricardo on the first floor and John on the second. At trial John relied on the defense of self-defense to justify the homicide. A full recitation of the events of the previous evening is, therefore, in order.

---

[1]We have published this case under the alias "John Doe" in order to preserve the confidentiality of the respondent's identity.

At approximately 10 p.m. on the evening of July 10, 1975, Ricardo Jose (Ricardo), a 43-year-old carpenter, discovered that one of his car windows had been broken. The car was parked at the rear of 212 Hanover Street. For some unknown reason, Ricardo assumed that John was responsible for the property damage to his car and summoned the police and his landlord to the premises. When the police arrived, Ricardo and John were arguing over the damage to Ricardo's car. Ricardo was accusing John, and John was denying that he had anything to do with the damage. All agree that Ricardo was intoxicated at the time. Since no one at the scene, including Ricardo, could substantiate Ricardo's allegation, the police officer informed Ricardo that he could not arrest John. At this news Ricardo became visibly upset. As the officer was leaving, John informed him that Ricardo had a knife. The officer took a 10- to 12-inch butcher knife away from Ricardo and placed it in the police car. Ricardo's landlord remained at the scene for approximately 45 minutes after the police left, trying to assuage Ricardo's temper. The landlord testified that Ricardo was drunk and was threatening to kill John.

After the landlord left, John walked to a nearby sandwich shop with Cindy, his 15-year-old girl friend. Cindy and John had been living together for over a year. In their absence Ida, another resident of 212 Hanover Street, saw Ricardo going up the fire escape on the side of the house. A moment later she heard the sound of breaking glass and shortly thereafter observed Ricardo entering the house by a back window. When John and Cindy returned to their second-story apartment, they noticed their television set was "all cracked up." The window leading to the fire escape was open. John told Cindy to get him the baseball bat that was by the door.[2] Upon learning from Ida that Ricardo had gone up the fire

---

[2]Cindy also procured a machete which she placed under some stairs in the front of the house, where it remained for the rest of the night. Cindy testified that John did not ask her to get the machete and did not touch it on the evening in question.

escape, John immediately sought to confront him. John banged on the door of Ricardo's first-floor apartment, first with his hand and then with the bat. When Ricardo refused to answer, John telephoned the police from a neighbor's apartment.

Officer Donald Barkley responded to the scene at approximately 1 a.m., July 11, 1975.[3] At that time John and Ricardo were engaged in what Officer Barkley called a "heavy argument." John accused Ricardo of breaking into his apartment and smashing his television set, and Ricardo countered by accusing John of entering his first-floor tenement and breaking his car window. When a second cruiser arrived on the scene, the combatants were placed in separate vehicles. Prior to placing Ricardo in the cruiser, Officer Barkley took a hammer away from him. After viewing the property damage, Officer Barkley informed both parties that the whole matter would have to be settled "downtown." When John asked Officer Barkley if he was going to get "locked up," the officer responded in the affirmative. At this point John stated: "I don't want to make a beef then, I will take care of it myself." Upon hearing this, Ricardo agreed to drop his charge also. Although both were warned to keep the peace, there was little cause for optimism in this regard, for each made comments which could be considered threats to the other. John allegedly said that the only way to straighten out this matter was to take Ricardo out in the backyard and "have it out with him." Ricardo allegedly retorted that "if anything came up they would take care of it later."

After the police left, John remained on the front steps with Cindy, Ida, Deborah, Ruth, and several others. Ricardo soon re-emerged from his apartment and began acting "crazy."

---

[3]This was not the first time Officer Barkley had responded to the Hanover Street address. At approximately 12:15 a.m. he had responded to a call to check for property damage. Upon arriving, he spoke with John on the front steps and was informed that other police officers had responded to the call and had straightened everything out. Apparently, John had not as yet discovered his broken television set.

All of the witnesses testifed that he was drunk. At this time Ricardo was armed with his third weapon of the evening, a short ax or hatchet. Ricardo threatened the kill John and his two dogs. John, according to the four women, generally ignored Ricardo, but occasionally responded by saying "leave me alone."

What transpired next is not entirely agreed upon. According to two of the women, John went around to the backyard followed shortly thereafter by Ricardo. The other women reported that Ricardo entered the backyard first, with John bringing up the rear. It is unclear exactly why either or both John and Ricardo decided to go into the backyard. Deborah thought that John wanted to check on his dogs, which, according to her, were in the backyard barking. Ida thought John had his dogs with him when he entered the backyard. Cindy, on the other hand, thought the dogs were in the house at the time. In any event, as John went into the backyard with his baseball bat, he allegedly told the onlookers that if Ricardo bothered him, he was going to 'f--- him up with the bat."

Ida was the only eyewitness to the ensuing altercation in the backyard. She testified that she spoke briefly to John through her rear kitchen window and then returned to the front steps. When Ricardo went into the backyard, Ida returned to her vantage point at the window. She testified that Ricardo started swinging his ax at John.[4] John, she said, backed away from Ricardo, saying: "Leave me alone. Now I

---

[4] In a signed statement given to the police, Ida did not mention that Ricardo swung the ax before John hit him with the baseball bat. At trial the trial justice accepted the City's allegation that is was "surprised" by Ida's testimony and allowed the City to impeach her by admitting her entire police statement. Although it is not entirely clear from the record, it would appear that the trial justice viewed the omission in the police statement as a prior inconsistent statement. However, Ida, who cannot read, insisted at trial that she had told the police that Ricardo swung the ax at John.

told you to leave me alone." John then struck Ricardo on the side or back of the head. Ricardo fell to the ground and, as he was getting up, he was struck a second time in the head. Ida shouted to John to stop hitting him, and then she ran to the front of the house to tell the others of the ongoing skirmish. Deborah, still standing in front of the premises, also heard John call out from the backyard: "Stay away from me. I told you to leave me alone."

Ida and some of the others in the front went from the front into the backyard. Ida testified that as she stood over the body, she could not detect any breathing. She believed that Ricardo was dead and so informed the others. John thought his adversary was just "knocked * * * out."

John and Cindy walked up the street and asked an older neighbor to take them to Cindy's mother's house. After being apprised of the circumstances, the neighbor prudently suggested that they return to the body and check on its condition. After checking the body and finding it to be "stiff," the neighbor left the scene, and John and Cindy went to Ida's apartment, where they played some records for about 20 minutes. As the two were preparing to go up to their apartment at approximately 2 a.m., a police officer who had been ordered to respond to a call that there was a disturbance at 212 Hanover Street entered the premises. Without mentioning the fact that there was a body in the backyard, John told the police everything was all right, and the police left.

Within a matter of minutes a Fire Department rescue squad arrived on the scene, and at approximately 2:30 a.m. Ricardo's body was discovered. The ax was found lying on a toolbox on the back porch approximately 15 to 20 feet away from the body. No evidence was introduced as to how the ax came to rest on the back porch or what fingerprints it did or did not contain. The baseball bat was never located.

At the conclusion of the trial, the Family Court[5] trial justice found John guilty of murder in the second degree and adjudged him to be a delinquent.

John's principal contention on appeal is that the trial justice erred as a matter of law when he placed upon John the burden of proof on the issue of self-defense. Until today the law in Rhode Island has been that a defendant seeking to excuse a killing by a plea of self-defense must prove that defense by a preponderance of the evidence. *State* v. *Ballou*, 20 R.I. 607, 40 A. 861 (1898). John contends, and we agree, that such is rule is no longer permissible under the due process clause of the fourteenth amendment to the United States Constitution. *Mullaney* v. *Wilbur*, 421 U.S. 684, 95 S. Ct. 1881, 44 L. Ed. 2d 508 (1975).

In *Mullaney* v. *Wilbur* the Supreme Court declared invalid the Maine murder statute under which a defendant, in order to rebut the statutory presumption that he committed the offense with "malice aforethought," had to prove by a preponderance of the evidence that he acted in the heat of passion on sudden provocation. The sole element distinguishing murder from manslaughter under the Maine statute — malice aforethought — was negated by and could not coexist with the defense of "heat of passion on sudden provocation." 421 U.S. at 684, 95 S. Ct. at 1882-83, 44 L. Ed. 2d at 511. Accordingly, the Court held that the prosecution was required "to prove beyond a reasonable doubt the absence of heat of passion on sudden provocation when the issue is properly presented in a homicide case." 421 U.S. at 704, 95 S. Ct. at 1892, 44 L. Ed. 2d at 522.

Although the Court did not directly address the issue with

---

[5]On appeal John has asked us to reconsider our holdings in *In re McCloud*, 110 R.I. 431, 293 A.2d 512 (1972), that a juvenile in a delinquency proceeding is not entitled by virtue of any constitutional or statutory grant to a trial by jury. We see no reason to do so at this time. *See McKeiver* v. *Pennsylvania*, 403 U.S. 528, 91 S. Ct. 1976, 29 L. Ed. 2d 647 (1971); *In re Wilkinson*, 116 R.I. 163, 353 A.2d 199 (1976).

which we are concerned — whether self-defense, like heat of passion, must be negated by the prosecution beyond a reasonable doubt — it twice referred to self-defense. The Court first noted that one of the elements of murder, that the homicide be "unlawful," was negated by the defense of self-defense. 421 U.S. at 685 n.1, 95 S. Ct. at 1883 n.1, 44 L. Ed. 2d at 512 n.1. Later, when rejecting the contention that requiring the prosecution to prove a negative imposed too heavy a burden, the Court noted:

> "Maine itself requires the prosecution to prove the absence of self-defense beyond a reasonable doubt. See *State* v. *Millett*, 273 A.2d 504 (1971). Satisfying this burden imposes an obligation that, in all practical effect, is identical to the burden involved in negating the heat of passion on sudden provocation." 421 U.S. at 702, 95 S. Ct. at 1891, 44 L. Ed. 2d at 521-22 (footnote omitted).

The *Mullaney* decision was "sharply limited"[6] last term in *Patterson* v. *New York*, 432 U.S. 197, 97 S. Ct. 2319, 53 L. Ed. 2d 281 (1977). In *Patterson* the Court upheld a New York statute which required the defendant in a prosecution for second-degree murder to prove by a preponderance of the evidence the "affirmative defense" of "extreme emotional disturbance" in order to reduce the crime to manslaughter. The Court distinguished *Mullaney* v. *Wilbur* by stressing that the Maine statute included as an indispensable element of murder a state of mind (malice aforethought) which was inconsistent with the "heat of passion" defense. 432 U.S. at 213, 97 S. Ct. at 2328, 53 L. Ed. 2d at 294. The New York statute under consideration in *Patterson* set forth only two elements for the crime of second-degree murder: causing the death of another and intending to do so. 432 U.S. at 198, 97 S. Ct. at 2321, 53 L. Ed. 2d at 285. The affirmative defense of extreme emotional disturbance did not negate any readily indentifiable element of second-degree murder.

---

[6]*The Supreme Court, 1976 Term*, 91 Harv. L. Rev. 70, 94 (1977).

"Thus, while proof of 'heat of passion' in Maine necessarily refuted an element of the crime of murder, proof of emotional disturbance in New York did not entail a refutation of an element or ingredient of that state's crime of murder." *The Supreme Court, 1976 Term*, 91 Harv. L. Rev. 70, 95-96 (1977).

While some have criticized the distinctions drawn in *Patterson* regarding affirmative defenses,[7] there is no question that the due process clause continues to protect "the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *Patterson* v. *New York*, 432 U.S. at 204, 97 S. Ct. at 2324, 53 L. Ed. 2d at 288, *quoting In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 1073, 25 L. Ed. 2d 368, 375 (1970).

Finally, the Supreme Court's decision in *Hankerson* v. *North Carolina*, 432 U.S. 233, 97 S. Ct. 2339, 53 L. Ed. 2d 306 (1977), decided the same day as *Patterson*, is also worthy of note. Although the precise holding of the case — that *Mullaney* v. *Wilbur* must be given retroactive effect — is not at issue here, the circumstances of the case are quite relevant. The Supreme Court of North Carolina had determined that, once some evidence of self-defense is introduced, *Mullaney* v. *Wilbur* required the prosecution to persuade the jury beyond a reasonable doubt that the homicide was not in self-defense. *State* v. *Hankerson*, 288 N.C. 632, 648-52, 220 S.E. 2d 575, 587-89 (1975). The reasoning of the North Carolina court is identical to that urged upon us by John: that *Mullaney* v. *Wilbur* requires the state to prove beyond a reasonable doubt all the elements of the crime, including that of unlawfulness, that is, that absence of self-defense. *Id.* The North Carolina

---

[7]*Patterson* v. *New York*, 432 U.S. 197, 223, 97 S. Ct. 2319, 2334, 53 L. Ed. 2d 281, 300 (1977) (Powell, J., dissenting); *The Supreme Court, 1976 Term*, 91 Harv. L. Rev. 70, 98-99 (1977); Allen, *The Restoration of In re Winship: A Comment on Burdens of Persuasion in Criminal Cases After Patterson v. New York*, 76 Mich. L. Rev. 30, 53-63 (1977); Underwood, *The Thumb on the Scales of Justice: Burdens of Persuasion in Criminal Cases*, 86 Yale L. J. 1299, 1314 n.56 (1977).

Supreme Court determined, however, that *Mullaney* v. *Wilbur* need not be given retroactive effect and affirmed Hankerson's conviction. In the Supreme Court of the United States, the state chose not to argue that, despite *Mullaney* v. *Wilbur,* it is constitutionally permissible for a state to treat self-defense as an affirmative defense that the prosecution need not negative by proof beyond a reasonable doubt. 432 U.S. at 240 n.6, 97 S. Ct. at 2344 n.6, 53 L. Ed. 2d at 314 n.6 In short, the issue we must face today was not raised by the parties and, therefore, not addressed by the Court.[8]

Even prior to the *Mullaney* decision, an apparent majority of the states required the prosecution to negate the defense of self-defense beyond a reasonable doubt once the defendant satisfied his burden of going forward with evidence of such nature and quality as to raise the issue. *E.g., State* v. *Carter,* 227 La. 820, 80 So. 2d 420 (1955); *State* v. *Millett,* 273 A.2d 504 (Me. 1971); *State* v. *Barrett,* 128 Vt. 458, 266 A.2d 441 (1970); 1 Wharton, *Criminal Evidence* §27 (13th ed. 1972); Annot., 43 A.L.R. 3d 221. Since *Mullaney* was decided, the size of this majority has increased. *Henderson* v. *State,* 234 Ga. 827, 218 S.E. 2d 612 (1975); *Evans* v. *State,* 28 Md. App. 640, 349 A.2d 300 (1975), aff'd 278 Md. 197, 362 A.2d 629 (1976); *Commonwealth* v. *Rodriguez,* 370 Mass. 684, 352 N.E. 2d 203 (1976); *State* v. *Hankerson,* 288 N.C. 632, 220 N.E. 575 (1975), *reversed on other grounds,* 432 U.S. 233, 97 S. Ct. 2339, 53 L. Ed. 2d 306 (1977); *State* v. *Roberts,* 88 Wash. 2d 337, 562 P.2d 1259 (1977).[9] Although it is, perhaps, too early to draw any firm conclusions, it does not appear that *Patterson* and *Hankerson* will precipitate a

---

[8]Mr. Justice Blackmun, joined by the Chief Justice, wrote a brief concurring opinion in which he emphasized that North Carolina could re-examine its self-defense ruling in light of *Patterson* v. *New York,* 432 U.S. 197, 97 S. Ct. 2319, 53 L. Ed. 2d 281 (1977).

[9]We have been able to discover only two cases which have held that *Mullaney* does not apply to the defense of self-defense. *St. Pierre* v. *State,* 92 Nev. 546, 554 P.2d 1126 (1976); *State* v. *Bolton,* 266 S.C. 444, 223 S.E.2d 863 (1976). Both opinions are brief and conclusory.

reappraisal of the generally accepted view that *Mullaney* prohibits a state from placing the burden of persuasion on the defendant to prove that he acted in self-defense. *See State* v. *Columbus,* Minn., 258 N.W.2d 122 (1977).

 Murder in Rhode Island is defined as the *"unlawful* killing of a human being with malice aforethought." (Emphasis added.) G.L. 1956 (1969 Reenactment) §11-23-1. To be "unlawful," a homicide must be neither justifiable nor excusable, that is, not in self-defense. *Mullaney* v. *Wilbur,* 421 U.S. at 685, 95 S. Ct. at 1883, 44 L. Ed. 2d at 512. The defense of self-defense, then, necessarily refutes and element of the crime of murder, as defined by §11-23-1. In this situation both *Mullaney* and *Patterson* indicate that the prosecution must negate the defense beyond a reasonable doubt. Accordingly, we hold that once the defendant introduces some evidence of self-defense, the burden of persuasion is on the prosecution to negate that defense beyond a reasonable doubt.[10]

 It is not entirely clear from the record in the instant case what burden of proof the trial justice placed on John regarding his claim of self-defense. In his bench decision the trial justice discussed burdens of proof somewhat briefly:

> "The burden of proof is on the State to prove its charge beyond a reasonable doubt. On a plea of self-defense, at least the burden of going forward with the evidence on self-defense is on the Respondent."

The import of the phrase "at least" is unclear. The key self-defense evidence in this case was obviously the testimony of Ida, the only eyewitness to the altercation, that the victim swung his ax at John while John demanded that he be left alone. In commenting on this evidence, the trial justice had this to say:

---

[10]To the extent *State* v. *Mellow,* 107 A. 871 (R.I. 1919), and *State* v. *Ballou,* 20 R.I. 607, 40 A. 861 (1898), are inconsistent with our decision today, they are overruled.

> "The Court finds that the testimony of one of the witnesses as to Ricardo Jose having the axe upraised *is not inconsistent with* Jose defending himself; that the language used by the defendant *is not conclusively* or *does not conclusively indicate* that the defendant was retreating * * *." (Emphasis added.)

This statement seems to imply that the trial justice was placing the burden of persuasion regarding self-defense on John. This result would have been consistent with the decisional law in Rhode Island at the time of trial. *State v. Mellow*, 107 A. 871 (R.I. 1919); *State v. Ballou*, 20 R.I. 607, 40 A. 861 (1898). Accordingly, it is difficult to conclude that the trial justice correctly placed the burden of persuasion regarding self-defense on the prosecution. Consequently, we must reverse John's delinquency adjudication.[11]

The respondent's appeal is sustained, the judgment appealed from is reversed, and the case is remanded to the Family Court.

*Julius C. Michaelson*, Attorney General, *E. Martin Stutchfield*, Assistant Attorney General, for petitioner.

*William F. Reilly*, Public Defender, *Barbara Hurst*, Chief Appellate Attorney, for respondent.

---

[11]In the light of this decision, we need not consider the other contentions John has raised in this appeal.