STATE

v.

Steven PARKHURST.

No. 96–63–Appeal.

Supreme Court of Rhode Island.

Jan. 20, 1998.

Andrea J. Mendes and Aaron L Weisman, Providence, for Plaintiff.

Paula Rosin, Providence, for Defendant.

Before WEISBERGER, C.J., and LEDERBERG, FLANDERS and GOLDBERG, JJ.

## OPINION

WEISBERGER, Chief Justice.

This case comes before us on appeal by the defendant, Steven Parkhurst (defendant or Parkhurst), following a conviction after a jury trial in the Providence County Superior Court on charges of first-degree murder, conspiracy to commit murder, breaking into and entering a dwelling house, theft of a motor vehicle, theft of a firearm, and possession of a stolen firearm when committing a crime of violence. The defendant was sentenced to life imprisonment for the murder and ten years' imprisonment each for the convictions of conspiracy to murder, breaking and entering of a residence, theft of a motor vehicle, and possession of a stolen firearm during the commission of a crime of violence. All sentences were to be served consecutively to the sentence of life imprisonment and to one another. A further consecutive five-year sentence was imposed for the theft of a firearm. We affirm the judgment of conviction. The facts of the case insofar as pertinent to this appeal are as follows.

On November 23, 1992, Francis Ramella, his wife, and their two daughters left their residence at 24 Jefferson Road, North Smithfield, Rhode Island, for a vacation in the Grand Cayman Islands. The Ramella's twenty-year-old son, Trevor, remained at home. Over the course of the following five nights, while the rest of the family vacationed, Trevor hosted parties in the family home attended by a number of teens and young adults, including defendant. During Monday night's festivities Trevor removed a .22 caliber revolver from his father's locked gun cabinet. Witnesses testified that during several of the nightly gatherings Trevor would carry the gun on his person while socializing with guests. On Wednesday evening, a confrontation erupted between Trevor and Parkhurst when Trevor suspected defendant of taking unfair advantage of an inebriated sixteen-year-old girl. Trevor ejected defendant from the party at gunpoint. Several guests attempted to defuse the situation by disarming Trevor and assuring defendant that it was "no big deal" and simply to let matters "blow over."

The defendant then left the party with Ryan Wright, Rebecca Moran, and Wendy Bouvier. The group left in Rebecca's car driven by defendant. After bringing Wendy home, defendant parked in a nearby parking lot to provide Rebecca time to sober up. During this period Rebecca overheard defendant and Wright talking. According to Rebecca, defendant told Wright he was angry at Trevor for pointing a gun at him and he wanted to "get [Trevor] back." As the two boys discussed the incident, they became increasingly agitated. They spoke of returning to the party to "kick his ass" before leaving the State of Rhode Island. By the end of the conversation Wright was urging defendant to act. Despite this exchange defendant and Wright did not return to the Ramella residence that evening.

The following night Rebecca and another friend, Sarah Dexter, met defendant at Trevor's house for another night of revelry. When Rebecca asked defendant whether he was serious about leaving the State of Rhode Island, Parkhurst responded that he had been drunk the night before and had not meant what he said. Subsequently Rebecca and Sarah left the Ramella residence and returned to Sarah's home for the night, where defendant and a second teen, Chris Ribidoux, met them shortly thereafter. Sarah then informed defendant that Trevor, earlier that evening, had demanded oral sex

from her. In response defendant allegedly stated, "Don't worry. I'm going to kill him on the last night of the party." Sarah testified that she believed defendant was jesting and dismissed his comments.

On Friday night, November 27, defendant and several others arrived at Trevor's house for another party. Trevor invited defendant into his home in spite of Wednesday night's confrontation. By 9:30 p.m., approximately forty youths had gathered at the Ramella residence. Concerned that matters were getting out of hand, Trevor brandished his father's revolver and ordered a number of people to leave the party, including defendant. Heath LeClair, a friend of Trevor, urged Trevor to put the gun away. Trevor opened the revolver and showed LeClair that although the gun was loaded, the next slot in the chamber was empty. Charles Mayer (Mayer), another friend of Trevor, also recalled Trevor having the revolver in his possession Friday night. He testified that although the gun was loaded, four chamber slots were empty for "safety" reasons. Upon Mayer's request Trevor placed the gun in his bedroom atop his bureau.

After being asked to leave the party, defendant and Ryan Wright obtained a ride from Jay O'Hara, Shar Chauvin, and a third boy in O'Hara's motor vehicle. The five teens drove to an Almac's parking lot where they met with friends to discuss attending another party in Burrillville, Rhode Island. Shar Chauvin testified that while en route to Almac's, defendant and Wright discussed how much they both disliked Trevor Ramella. According to Chauvin, defendant stated that Trevor had humiliated him in front of his friends and that he should have "done something" in retaliation. However, Jay O'Hara, the driver of the motor vehicle, did not recall defendant's having made any disparaging remarks.

After attending the Burrillville party for approximately twenty minutes, defendant suggested that the group return to Trevor's party, and they all agreed. Upon their return the teens spotted two police cruisers parked in front of the Ramella residence so they drove past the house and pulled into the next-door neighbor's driveway. Once

parked, Wright and defendant jumped out of the car and ran into the woods. Both defendant and Wright returned to Trevor's house immediately after the police had left and Trevor quickly ushered them in.

Eventually only a handful of people remained at the Ramella home. Several witnesses testified that Trevor gave defendant and Wright permission to stay the night because Parkhurst had wrecked his car earlier in the week after having left one of Trevor's parties drunk. However, Jonathan Lautieri, a friend of Trevor present at the party that evening, recalled Trevor's objecting to defendant's sleeping over, preferring that he arrange a ride home. Brian Heroux, another guest present at the party that evening, testified that Trevor had asked him to offer defendant and Wright a ride to their homes in Woonsocket. When he did, both defendant and Wright refused. Thereafter, Trevor volunteered to drive the two teens home in the morning. After Brian Heroux left the party, six people remained at the Ramella residence—defendant, Wright, Trevor, Mayer, William Bergeron (Bergeron), and Ali Girard (Girard—Trevor's girlfriend). Trevor, Mayer, Bergeron, and Girard were in the basement playing pool while defendant and Wright watched television upstairs.

Mayer testified that after hearing noises resembling people running about the household, he and Trevor proceeded upstairs to investigate. Once upstairs the two observed that the television was off and that defendant and Wright were gone from the room. Quickly Trevor headed for his bedroom, followed by Mayer. Almost immediately Trevor exclaimed, "[T]hey got my guns," and ran from the room. After checking the bedroom, Mayer discovered that the revolver was missing from Trevor's bureau. He also noticed that a black-powder hunting rifle was gone and that the contents of an ammunition bag were scattered on the floor. Mayer then raced toward the front door in pursuit of his friend. After reaching the front door, he looked out the window and saw Trevor lying face down in a pool of blood. Mayer observed defendant standing over Trevor's body with a revolver in his hand. Wright stood to the right of Trevor, holding the

barrel of a rifle. Immediately Mayer ducked behind the front door and locked it. He told Bergeron and Girard that Trevor was "down." Speeding to Trevor's bedroom, Mayer retrieved a shotgun from under the bed and loaded it. As the three discussed what to do next, they heard the sound of breaking glass. Hearing voices emanating from the basement, the trio quickly left the house through a back door.

Minutes later Bergeron and Girard heard a car "peeling out" from the Ramella's driveway. Mayer, meanwhile, was urging a neighbor to call 911. Upon his return he noticed that the Ramella's Toyota Celica was missing from the driveway.

Police and emergency medical personnel soon arrived at the scene. According to police and other witnesses, the front of the house was well lit with exterior flood lights. The medical technician observed a small bullet hole in the back of Trevor's head. The body was lying face down, and the area was awash in blood. Upon turning the body over, the technician noted that Trevor had suffered extensive facial trauma, including cheek and lip lacerations. Two of his teeth and a piece of facial skin were found on the sidewalk. A third tooth was located under his left arm. Trevor's wallet was lying on the lawn seven feet from his body, blood stained, open, and emptied of cash. Pieces of the gunstock of a rifle were found near his body. Detecting no cardiac function, the medical technician turned the body over to representatives of the medical examiner. The barrel of the rifle was found several days later by Trevor's father in a nearby wood pile.

When questioned by police, Mayer recalled defendant's first name and the name of Tara Lanctot, defendant's friend who had also been present at the party that evening. Within hours, at the police station, Lanctot identified a photograph of defendant. Soon thereafter, Mayer, Girard, and Bergeron positively identified defendant from a photographic array. Mayer specifically identified defendant as the man who stood over Trevor's body, holding the revolver.

At trial the state presented expert testimony concerning the nature and cause of Trevor's wounds. The assistant medical examiner, John Duvally, testified that Trevor had suffered abrasions over the left eye and forehead area. He stated that under Trevor's right eye and between the eye and the right ear were deep lacerations caused by blunt trauma. In addition both of Trevor's lips were split through the middle and macerated. Four more lacerations were observed below the bottom lip, and Trevor's teeth were completely smashed and floating free in his mouth. Trevor's lower jaw and the cheek bones that cover the sinuses were pulverized. The assistant medical examiner testified that Trevor had suffered internal hemorrhaging on the right side of his neck and a bruising of his chest area. In Duvally's opinion it was highly unlikely that these injuries were caused by the victim falling to the ground. Rather he expressed the opinion that the victim had received at least four and as many as six blows to the head with a blunt instrument, such as the butt of a rifle. He testified that the cause of death, however, was a bullet wound to the back of the head found behind Trevor's left ear, and shot by a gun from a distance of two or more feet. In the assistant medical examiner's opinion Trevor's death was a homicide.

Two days later, defendant and Wright were arrested in the State of Indiana, driving the Ramella's Toyota Celica bearing New York license plates. The two were transported to a juvenile detention center in Fort Wayne, Indiana.[1] Francis Ramella's .22 caliber revolver was found under the driver's seat. An employee of the youth center, Gary Grant, testified at trial. He claimed to have overheard defendant and Wright explain to other youths in the center's recreation room the reason for their presence in Indiana. According to Grant, Wright stated that defendant had killed a boy in Rhode Island and that they were on their way to California. They got caught, Wright explained, only because defendant had stopped and asked for directions.

---

1. At the time of the killing both defendant and Wright were minors. They were tried as adults in Superior Court, the Family Court having waived jurisdiction pursuant to Rule 12 of the Family Court Rules of Juvenile Proceedings.

The defendant's version of the events leading to Trevor's death varied considerably from that presented to the jury by the state. He claimed that Trevor's death was an accident caused in part by his drunkenness. According to defendant, he had consumed approximately twelve beers on the evening of the shooting. At about midnight he and Wright were watching television at Trevor's house when Wright got up to go to the bathroom. When Wright returned, he had the revolver in his hand. The defendant testified that he took the revolver from Wright, who then left the room a second time and returned minutes later with a rifle. Feeling ill, defendant went outside for some fresh air. Once outside, defendant began playing with the revolver, "pulling the hammer back, * * * [and] spinning the cylinder." While playing with the gun, defendant shot off two rounds. Minutes later Trevor came running out of the house, and the gun went off. The defendant testified that Trevor then fell toward him. He explained that he never looked at Trevor's body, or saw any blood. On cross-examination, however, defendant could not explain why the body was found in such a position as to suggest that it fell toward the house. Nor could he explain why Trevor's wallet was found seven feet from his body or how he came to possess the keys to the Ramella's Toyota Celica. The defendant denied going through Trevor's trouser's pockets. He testified that when he attempted to go back into the house to find help, the door was locked. Wright then broke the front-door window with the rifle, and defendant reached inside and unlocked the door. However, defendant admitted that once inside the house he did not call out for help or dial 911. He also admitted to keeping the gun in his hand as he searched the house for people. The defendant testified that in a panic he and Wright fled in the Ramella's Toyota Celica. He denied ever seeing Wright pummel Trevor about the face with the butt of the rifle.

The jury found defendant guilty of first-degree murder, conspiracy to commit murder, breaking and entering, larceny of a firearm, and carrying a stolen firearm while committing a crime of violence. The trial justice denied defendant's motion for a new trial, and defendant filed a timely appeal to this court. In support of his appeal defendant raises a number of issues. Additional facts will be furnished as needed in order to deal with those issues.

## I

### Refusal of the Trial Justice to Give the Requested Accident Instruction

■ The defendant first claims that the trial justice erred by failing to instruct the jury that the state had the burden of disproving accident, beyond a reasonable doubt. The trial justice's failure to instruct the jury in this manner, he contends, may have caused the jury to believe that the defense bore the burden of proving accident. The defendant claims that such an understanding by the jury would violate his constitutional right that the state bear the burden of proving, beyond a reasonable doubt, every fact necessary to constitute the crime of which he is charged. *See, e.g., In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368, 375 (1970). We are of the opinion that the trial justice did not err in failing to give the requested accident instruction.

■ It is well settled that a defendant is entitled to a charge that explains and informs the jury of "those propositions of law that relate to the material issues of fact that the evidence tends to support." *State v. D'Alo,* 435 A.2d 317, 319 (R.I.1981); *see State v. Fetzik,* 577 A.2d 990, 996 (R.I.1990); G.L. 1956 § 8–2–38. Nonetheless the trial justice is free to instruct the jury in his or her own words, provided that he or she states the applicable law. *State v. Marini,* 638 A.2d 507, 517 (R.I.1994). When a criminal defendant's requested instructions are adequately covered by the instructions given to the jury, refusal to give the requested instructions is not error. *D'Alo,* 435 A.2d at 319–20. In determining the correctness of a jury charge, "we determine how a jury composed of ordinarily intelligent persons listening to that instruction at the close of trial would have [interpreted] the instructions as a whole." *State v. Cipriano,* 430 A.2d 1258, 1262 (R.I. 1981). Viewing the charge in this manner, we do not believe that a reasonable juror

could have misconstrued the trial justice's instructions to require defendant to prove that the death of Trevor Ramella was an accident before entitling him to an acquittal.

In the present case, defendant was entitled to and received an instruction that informed the jury that the state must prove beyond a reasonable doubt every fact necessary to constitute the crime of first-degree murder and the lesser included crimes of second-degree murder and voluntary manslaughter. A review of the record before us reveals that the trial justice's instructions to the jury covers better than sixty-five pages of transcript and states in pertinent part:

"[I]n order for the State in this case to be entitled to your verdict of guilty on the charge of first-degree murder, it must prove to you beyond a reasonable doubt the following three facts: One, that on November 28th, 1992, in North Smithfield, [Trevor Ramella] was killed by the willful, deliberate, and premeditated intentional act of Steven Parkhurst; that the willful, deliberate, intentional, and premeditated intention to kill was for more than of momentary duration, and three, that at the time, Steven Parkhurst was not so intoxicated as to be unable to harbor or form the required specific premeditation, intention, and malice to kill Trevor Ramella.

"With regard to the crime of second-degree murder, the State must prove beyond a reasonable doubt two facts: One, that Steven Parkhurst intentionally, unlawfully killed Trevor Ramella on November 28th, 1992, in North Smithfield, with malice aforethought of less than of momentary duration; and two, that at the time, Steven Parkhurst was not so intoxicated as to be unable to harbor or form the required malice aforethought to kill Trevor Ramella.

"**Now, in the event that you should find that the State has failed to prove to you beyond a reasonable doubt,** either the charge of murder in the first degree or murder in the second degree, you may then take up and consider whether or not the killing of Trevor Ramella, if done by the defendant, Steven Parkhurst, amounted to what in law is referred to as the crime of voluntary manslaughter.

" * * *

"Voluntary manslaughter is the unlawful but intentional killing of a human being, without malice aforethought, and for which the law places responsibility on a person because he is guilty of an unlawful act of a nature which is not so wrong as to make the defendant liable for murder in the first or second degree, but which is not so harmless as to make him not responsible, at all.

"For example, if you should find that Steven Parkhurst unlawfully but intentionally killed Trevor Ramella, without malice aforethought, and while acting on sudden impulse or in sudden heat of passion or anger, produced or brought about by adequate provocation, or while he was intoxicated to the degree earlier discussed, then such killing would constitute voluntary manslaughter.

"**Now, with regard to all that I have explained and instructed** upon with regard to murder in the first and second degree, and with regard to the crime of voluntary manslaughter, I must caution you as follows: If you should find and conclude from all the evidence that the death of Trevor Ramella was not intentional on the part of Steven Parkhurst, but was instead accidental, which means as the result of accidental action by Steven Parkhurst, then such killing by Mr. Parkhurst, is neither murder in the first, or second-degree, nor voluntary manslaughter, and in such event, your verdict with regard to crimes of murder in the first or second degree and voluntary manslaughter must be 'not guilty.' " (Emphases added.)

■ This portion of the trial justice's instructions clearly reveals that the accident charge is immediately prefaced with language informing the jury of the State's burden of proof as it relates to the charge of murder. The close proximity of the state's burden-language to the accident charge negates any potential burden-shifting effect that the accident instruction, standing alone, might have had on the jury. Moreover, the trial justice's definition of first and second-degree murder as well as voluntary manslaughter requires the state to prove an in-

tentional killing. Such an instruction of necessity negates an accidental death brought about by nonculpable conduct. *See, e.g., State v. Freeman,* 473 A.2d 1149, 1151 (R.I. 1984).

Apart from these instructions we note that the trial justice repeatedly informed the jury that the burden was on the state to prove beyond a reasonable doubt each and every element of the crimes for which defendant is on trial.[2] The trial justice emphasized that "[t]he defendant has no burden in a criminal case." He further instructed the jury that "[a] defendant in a criminal case, has no burden to prove anything." Rather "the State has the burden of proving the guilt of the defendant beyond a reasonable doubt."

The defendant's reliance on this court's decision in *State v. Baker,* 417 A.2d 906 (R.I.1980), does not persuade us to conclude that the constitutional principles breached in that instance were likewise contravened in the present case. Charged with murder, Baker was convicted by a jury of voluntary manslaughter. *Id.* at 907. He admitted to stabbing the victim in the chest intentionally, but alleged that he did so in self-defense. *Id.* at 907–08. Thus there was no possibility that the death of the victim was an accident. Rather the trial justice instructed that should the jury find that the defendant had acted in self-defense, its verdict must be "not guilty." *Id.* at 909. Vacating the defendant's conviction, this court held that the trial justice's instruction could be interpreted by a reasonable juror as placing upon the defendant the burden of proving that he acted in self-defense. *Id.* at 910–11. Such an instruction, we stated, would be in contravention of the Supreme Court's decision in *Mullaney v. Wilbur,* 421 U.S. 684, 704, 95 S.Ct. 1881, 1892, 44 L.Ed.2d 508, 522 (1975), wherein the Court invalidated a Maine murder statute that required the defendant to prove, by a preponderance of the evidence, that he acted

in the heat of passion. *Baker,* 417 A.2d at 910–11.

The decision in *Baker,* however, must be viewed in its historical context. Until 1978 the law in the state of Rhode Island required a defendant seeking to excuse a killing by a plea of self-defense to prove that defense by a preponderance of the evidence. *State v. Ballou,* 20 R.I. 607, 613, 40 A. 861, 864 (1898). This court altered that rule of law in the case of *In re John Doe,* 120 R.I. 732, 738–42, 390 A.2d 920, 924–26 (1978) (holding that once a criminal defendant introduces evidence of self-defense the burden of persuasion is on the prosecution to negate that defense beyond a reasonable doubt) in part to comport with the Supreme Court's decision in *Mullaney.* Subsequently the Supreme Court of the United States clarified its position in *Martin v. Ohio,* 480 U.S. 228, 236, 107 S.Ct. 1098, 1103, 94 L.Ed.2d 267, 275–76 (1987), holding that the burden of proving self-defense might be placed upon a defendant without violating the principles of due process. *Id.* However, the Rhode Island rule was not changed. *See Baker,* 417 A.2d at 910–11. *Baker* was one of two decisions published within twenty-four months of *In re John Doe* that clearly reflected the change in Rhode Island law and dispelled any lingering confusion about the state's burden of proof in a homicide case. *See also Infantolino v. State,* 414 A.2d 793 (R.I.1980). Unlike the circumstances of *Baker,* no such doubt concerning the state's burden of proof is present in the record before us. Here, the trial justice clearly informed the jury that the state must prove beyond a reasonable doubt an intentional killing to be entitled to a verdict of first- or second-degree murder or voluntary manslaughter. This instruction completely precludes a nonculpable accidental homicide. The jury's verdict of first-degree murder reflects a finding on its part that the death of Trevor Ramella was brought about by intentional means.[3] We

---

**2.** The trial justice emphasized that "[s]hould you find that the State has failed to prove beyond a reasonable doubt the charge of murder in the first degree, you may then consider and determine whether or not the defendant *has been proven to be guilty* of murder in the second degree, or, of the crime of voluntary manslaughter." (Emphasis added.)

**3.** For the purpose of clarification we acknowledge that an accidental killing is one resulting from a lawful act lawfully carried out by one under a reasonable belief that no harm is possible. A defendant, nonetheless may claim that another's death was an accident because it was brought about by unintentional means. In such circumstances a defendant's actions, though not

are satisfied from an examination of the record that the trial justice adequately presented to the jury the state's burden of proof in respect to each element of the charged offenses and also instructed the jury adequately concerning defendant's claim of accidental homicide.

## II

### Second-Degree Murder Instructions

■ In a related claim of error defendant argues that the trial justice's instructions to the jury concerning second-degree murder were so confusing and contradictory that a reversal of his conviction is required. In support of his position defendant directs our attention to that portion of the jury charge wherein the trial justice instructs that "[p]remeditation and deliberation are not elements of murder in the second degree" but subsequently instructs that "the distinction between first and second-degree murder is the length of time of the premeditation." We are of the opinion that the trial justice's instructions on the matter, though not perfect, adequately informed the jury of the elements the state had to prove beyond a reasonable doubt to obtain a conviction of both first- and second-degree murder and were so conceded by defense counsel at trial.

■ Murder is defined as "[t]he unlawful killing of a human being with malice aforethought." General Laws 1956 § 11–23–1, as amended by P.L.1990, ch. 284, § 4. First-degree murder is

"[e]very murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing, or committed in the perpetration of, or attempt to perpetrate, any arson * * * rape * * * sexual assault or child molestation, burglary or breaking and entering, robbery, kidnapping, or * * * felony manufacture, sale, delivery, or other distribution of a controlled substance * * * or while resisting arrest * * * or perpetrated from a premeditated design unlawfully and maliciously to effect the

death of any human being other than him or her who is killed * * *. Any other murder is murder in the second degree." *Id.*

Second-degree murder, therefore, is any killing of a human being committed with malice aforethought that is not defined by statute as first-degree murder. *See* § 11–23–1. Malice aforethought, which is an element of both first- and second-degree murder, *State v. Mattatall*, 603 A.2d 1098, 1105 (R.I.1992), consists of an "unjustified disregard for the possibility of death or great bodily harm and an extreme indifference to the sanctity of human life." *State v. McGranahan*, 415 A.2d 1298, 1302 (R.I.1980). A prosecutor may establish this element of second-degree murder by three means: (1) showing a premeditated intent to kill in the mind of the accused for a very brief time before the killing, (2) proving the defendant's conscious disregard for the possibility of death or great bodily harm, or (3) establishing that the defendant committed a homicide in the perpetration of an inherently dangerous felony not enumerated as a first-degree-murder felony. *State v. Iovino*, 554 A.2d 1037, 1039 (R.I.1989); *see also* § 11–23–1. Intent to kill is not a required element of second-degree murder when the state moves to convict a defendant on a theory of wanton recklessness or felony murder. However, if the state proceeds on a theory of an intent to kill and the duration of the intent to kill is questionable, an instruction on both first- and second-degree murder should be given. *State v. Fenik*, 45 R.I. 309, 315, 121 A. 218, 221 (1923). In such an instance the trial justice must set forth for the jury the determinative factor that distinguishes first-degree from second-degree murder. Murder in the first degree requires the state to prove beyond a reasonable doubt a premeditated intent to kill of more than a momentary duration in the mind of the accused, *State v. Grabowski*, 644 A.2d 1282, 1285 (R.I.1994), whereas if the formation of the intent to kill is merely momentary, the offense is murder in the second degree. *Id.* In certain circum-

---

sufficient to constitute the crime of murder or voluntary manslaughter, may well constitute involuntary manslaughter if death is the result of

criminal negligence or an unlawful act not amounting to a felony.

stances all three theories of second-degree murder and a theory of first-degree murder may be supported by the evidence and thus properly submitted to the jury.

In the present case the trial justice charged the jury on first- and second-degree murder and voluntary manslaughter. The second-degree-murder charge encompassed both a momentary premeditation and a wanton, reckless theory of killing. More importantly, the charge, viewed in its entirety, adequately set forth for the jury the elements of first- and second-degree murder and the factors distinguishing the two offenses.

Indeed, during deliberations the jury twice requested that the trial justice repeat the differences between first- and second-degree murder and voluntary manslaughter and to repeat the burden of the state as it relates to each offense. The trial justice, in response, repeated his charge and emphasized that

> "the difference between first- and second-degree murder is the length of time of the premeditation and the malice aforethought. If it's for more than of momentary duration, its murder in the first degree. If it's less than of momentary duration, however brief, its murder in the second degree."

"[M]omentary," the trial justice instructed, is defined as " '[l]asting but a moment or a very short time; fleeting.' " Subsequently the trial justice gave defense counsel's requested premeditation instructions "as it relates to second degree murder." Specifically he stated:

> "[L]adies and gentlemen of the jury, counsel [has] requested * * * that * * * I should reiterate for you once again, that definition of the premeditation, or at least one reminder of the requirement of premeditation in murder in the first, and murder in the second degree, its distinction. * * * The premeditation necessary to con-

stitute murder in the first degree, must be shown to have existed for more than of a barely appreciable length of time before the killing; that is, it must have had something more than of momentary existence. That's, of course, first-degree murder. "Second degree murder is less than of momentary duration however brief." [4]

Immediately thereafter the trial justice inquired whether defense counsel was satisfied with the instructions as repeated to the jury, and defense counsel responded affirmatively. It is well settled that a defendant, except in narrow circumstances not present in the instant case, cannot challenge jury instructions on appeal unless he or she has objected to the charge as given. *State v. Vargas*, 420 A.2d 809, 815–16 (R.I.1980). Defense counsel's failure to object to the trial justice's charge as repeated to the jury constitutes a waiver of the right to allege imperfections on appeal. However, even if defendant had preserved the issue for review, we are of the opinion that no prejudice occurred. In returning a verdict of first-degree murder, the jury found that the defendant harbored, for more than merely a moment, a premeditated intent to kill Trevor Ramella. Hence any uncertainty caused by the apparent contradiction in the trial justice's instructions on premeditation as it relates to second-degree murder is of no consequence.

## III

### Refusal of the Trial Justice to Instruct on Involuntary Manslaughter

The defendant also asserts that the trial justice erred in refusing to instruct the jury on the lesser included offense of involuntary manslaughter. He maintains that an involuntary-manslaughter instruction was warranted because the jury could have inferred from his testimony that he acted unintentionally in a criminally negligent manner or while committing a misdemeanor. We disagree.

---

4. The language of the trial justice is unfortunate in that the phrase "less than of momentary duration" is not a meaningful definition of the formation of an intent. It would be preferable to say that the formation of intent of momentary duration, as suggested in *State v. Fenik*, 45 R.I. 309, 315, 121 A. 218, 221 (1923), is sufficient to meet the requirement of second-degree murder. However, the ambiguity of the trial justice's phrase was not prejudicial to defendant in the instant case since the jury found that Parkhurst had committed murder in the first degree. The definition of this crime was clear and unambiguous.

■ It is well settled "that instructions should not be given on lesser degrees of murder or manslaughter unless there is evidence in the case to support such a finding." *State v. Tarvis*, 465 A.2d 164, 171 (R.I.1983) (quoting *State v. Cline*, 122 R.I. 297, 319, 405 A.2d 1192, 1204 (1979)). This court has defined involuntary manslaughter as an unintentional homicide without malice aforethought, committed while in the performance of an unlawful act not amounting to a felony or in the performance of a lawful act with criminal negligence. *State v. McLaughlin*, 621 A.2d 170, 174 (R.I.1993); *State v. Hockenhull*, 525 A.2d 926, 929 (R.I.1987). In the present case the record reveals that defendant was engaged in the commission of a felony when he shot and killed Trevor Ramella. Hence he was not entitled to an instruction on involuntary manslaughter, and the trial justice, upon this ground, properly denied defendant's request.

General Laws 1956 § 11–47–8(a) provides in pertinent part:

"No person shall, without a license or permit * * * carry a pistol or revolver * * * on or about his or her person * * * except in his or her dwelling house or place of business or on land possessed by him or her * * *. * * * Every person violating the provision of this section shall, upon conviction, be punished by imprisonment for not less than one nor more than ten (10) years or by a fine up to ten thousand dollars ($10,000), or both * * *."

At trial, defendant himself admitted to possessing and carrying the murder weapon, a .22 caliber pistol, and firing it. He recalled shooting Trevor Ramella with the pistol outside the Ramella's North Smithfield home. The uncontroverted evidence was that Trevor's father owned the gun and that defendant had no right to possess it. Although defendant testified that the shooting was an accident, the only relevant inquiry is whether defendant was licensed to carry the firearm.

He was not, nor was he on his own property when he fired the gun. The unequivocal evidence, therefore, is that defendant was in violation of the provisions of § 11–47–8(a) when he shot and killed Trevor Ramella. Violation of § 11–47–8(a) is punishable by imprisonment for a term exceeding one year and thus constitutes a felony.

We conclude that defendant's reliance on *State v. Robbio*, 526 A.2d 509 (R.I.1987), is misplaced. Robbio was convicted of involuntary manslaughter in the shooting death of his three-year-old daughter. Unlike defendant, Robbio was dry-firing *his own* pistol in *his home*. *Id.* at 510–11. There was no evidence that the killing in that instance occurred while Robbio was committing an unlawful act amounting to a felony. In the present case defendant's own testimony demonstrates that he was engaged in a felony at the time of the killing. Since the evidence failed to support a finding of involuntary manslaughter, the trial justice properly denied defendant's request for a jury instruction on the offense.

## IV

### Admission of Evidence of Other Crimes

■ The defendant next argues that the trial justice erred by admitting evidence of other crimes he allegedly committed, independent of the offenses charged, on the basis that such evidence was irrelevant and highly prejudicial. Specifically the state presented evidence that four hours after killing Trevor Ramella, defendant and Wright used the murder weapon to rob a Howard Johnson hotel clerk in Darien, Connecticut. The clerk, Jeffrey Andleman, positively identified defendant as the man who placed the revolver to his head and demanded the hotel's money. Defense counsel sought to suppress this evidence, both before and during trial, pursuant to Rule 404(b) of the Rhode Island Rules of Evidence.[5]

5. Evidence presented during pretrial hearings implicated defendant and Wright in various crimes committed in several states following their flight from Rhode Island. The first was committed approximately ninety minutes after the Ramella killing and involved an attempted robbery of a man in his car at a rest stop in Mystic, Connecticut. The victim was shot four times, twice in the face. Another robbery occurred in Branford, Connecticut, but the victim in that case, a hotel clerk, was unable positively to identify defendant. Soon thereafter Jeffrey Andleman was robbed in Darien, Connecticut. He was able positively to identify defendant and

Rule 404(b) provides in pertinent part:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or to prove that defendant feared imminent bodily harm and that the fear was reasonable."

Although Rule 404(b) mandates that evidence of other crimes or bad acts is not admissible to prove the propensity of a defendant to commit crime, such evidence is admissible to show a fact that tends to prove that the defendant is guilty of the crime charged. *State v. Stewart*, 663 A.2d 912, 923 (R.I.1995); *State v. Lemon*, 497 A.2d 713, 720 (R.I.1985). Evidence of other criminal conduct may be presented to the jury, therefore, when it tends to establish motive, intent, absence of mistake or accident, common plan or scheme, or the identity of the perpetrator. We have also stated that evidence of uncharged crimes "interwoven with the offense for which the defendant is being tried, or [which] directly support a finding of guilty knowledge in the perpetration of that offense," is relevant and should be admitted. *Stewart*, 663 A.2d at 923 (quoting *State v. Cardoza*, 465 A.2d 200, 202 (R.I.1983)). In such an instance, admitting the evidence allows "a trier of fact to hear a complete and, it is to be hoped, coherent story so as to make an accurate determination of guilt or innocence." *State v. Gomes*, 690 A.2d 310, 316 (R.I.1997). The mere fact that such evidence is prejudicial to a defendant does not render it inadmissible.

In the present case defense counsel argued to the jury that defendant accidentally shot Trevor Ramella as a result of being intoxicated. To rebut this claim, the trial justice permitted the prosecution to present evidence of defendant's involvement in the Connecticut robbery. The defendant asserts on appeal that when the state introduced evidence of the robbery, the issue of accident due to intoxication had not yet been raised because the defense had not presented its case to the jury. Hence he claims that the trial justice improperly admitted this evidence in anticipation of a defense not yet proffered. We disagree. Our examination of the record reveals that during cross-examination of state witnesses, defense counsel asked more than thirty questions pertaining to the consumption of alcohol and defendant's participation therein. Defense counsel asked state witnesses to estimate the number of people present at Trevor's party on the night of the shooting, and whether "everyone" was drinking at the party, the amount and kind of alcohol consumed during the party, whether he or she had seen defendant drinking that night, or whether the witness remembered defendant's being drunk. In response at least two witnesses recalled defendant's drinking beer on the night Trevor was shot, and one witness considered him drunk. Plainly defense counsel raised the issue of intoxication before presenting defendant's case to the jury. The state then had the burden of negating intoxication in order to prove defendant's premeditated intent to kill. *State v. Sanden*, 626 A.2d 194, 199 (R.I.1993). Commission of the Connecticut robbery four hours after the killing and defendant's deliberate use of the revolver to effectuate that crime tend to rebut the claim of an accidental shooting caused by intoxication. Indeed defendant claimed complete unfamiliarity with the use of a gun at trial. He testified that he "didn't know anything about guns," did not know how to open a gun, and "did not associate with them." "For all [he] knew [the murder weapon] could have been a BB gun or a pellet gun." The defendant testified that he was drunk and "didn't realize * * * this gun * * * could do all" that. He stated

---

Wright and the .22 caliber revolver defendant used in that robbery. The state also presented evidence of an attempted robbery of a motel in Ohio, twenty miles from the location where defendant and Wright were apprehended. The witnesses described the assailants as two young white males driving a gray foreign car with New York license plates L6H281. The defendant and Wright were arrested in Indiana about a half an hour later, driving the Ramella's Toyota Celica bearing New York license plates L6H281.

The state, however, only presented evidence of the Darien, Connecticut robbery at trial.

that he did know Trevor was shot, but could not recall taking his car keys or making any stops in the State of Connecticut. Doubtless defendant's direct testimony relating to the shooting gave rise to the implication that while intoxicated and ignorant of the peril posed by a .22 caliber pistol, defendant accidentally shot and killed Trevor Ramella. The state, therefore, had a right to diminish the likelihood the jury would draw such an inference. *See, e.g., State v. Dowell,* 512 A.2d 121, 124 (R.I.1986). The mere fact that evidence of the Connecticut robbery was introduced during the prosecutor's case in chief rather than in rebuttal is inconsequential in light of the obvious attempt by defense counsel to raise the jury's consciousness of defendant's diminished capacity during cross-examination.

We also observe that evidence of the Connecticut robbery was probative of defendant's stated intention to kill Trevor Ramella and finance his flight from authority. At trial the state presented evidence that two days before the shooting, Rebecca Moran overheard defendant and Wright discussing plans to harm Trevor and to leave the State of Rhode Island. The following evening defendant allegedly told Sarah Dexter that he planned to kill Trevor "on the last night of the party." The robbery was therefore relevant to corroborate evidence of a conspiracy between defendant and Wright to kill Trevor Ramella and leave the State of Rhode Island. Clearly the crime was inextricably linked with defendant's flight from the killing and his efforts to escape prosecution. Hence the trial justice admitted this evidence, not for the improper purpose of proving propensity, but for the proper purpose of proving premeditation and consciousness of guilt.

 In a related claim defendant asserts that the trial justice erroneously allowed the state to elicit testimony from him on cross-examination that several years before the shooting he and Wright stole Wright's mother's car and left the State of Rhode Island. The trial justice permitted the cross-examination in light of defendant's direct testimony indicating that Rebecca Moran misunderstood the context of his conversation with Wright concerning harming

Trevor and fleeing the state. The trial justice precluded Rebecca from testifying at trial that she overheard defendant and Wright planning to finance their flight from the state by burglarizing homes. On cross-examination defense counsel asked Rebecca whether defendant and Wright ever discussed an incident in their past when the two boys ran away together. Rebecca answered affirmatively. Subsequently defendant testified that Rebecca merely overheard him and Wright reminiscing about a boyhood excursion from home. In order to diminish this implication the trial justice permitted the prosecutor to explore this same subject matter on cross-examination. Thereafter defendant revealed that he and Wright had taken a car owned by Wright's mother without permission, had left the state, and had eventually been stopped by police. In light of the fact that one basic purpose of cross-examination is impeachment, we have held that the scope of that examination must be left to the sound discretion of the trial justice rather than be subject to any fixed limit. *See State v. Kholi,* 672 A.2d 429, 433 (R.I.1996). The trial justice's ruling on the matter will be left undisturbed by this court absent a showing of a clear abuse of that discretion. *State v. Veluzat,* 578 A.2d 93, 95 (R.I.1990). Given that defense counsel opened this line of inquiry, we are of the opinion that the trial justice did not abuse his discretion in allowing further exploration of the matter on cross-examination. *See, e.g., State v. Pacheco,* 481 A.2d 1009, 1027 (R.I.1984); *State v. Mastracchio,* 112 R.I. 487, 495, 312 A.2d 190, 195 (1973).

 The defendant also contends that the trial justice improperly instructed the jury about the purpose for which it may consider evidence of uncharged crimes. Specifically he objects to that portion of the instruction wherein the jury was told that other crimes are relevant if those crimes are "interwoven with the * * * charged acts for which the defendant is on trial, in such a way, that it tends to establish criminal disposition." It is well settled that a defendant's criminal conduct may not be considered by the jury as evidence of a defendant's propensity to commit the crime charged, and a trial

justice must instruct the jury accordingly. *State v. Chartier*, 619 A.2d 1119, 1122–23 (R.I.1993); *State v. Jalette*, 119 R.I. 614, 627–28, 382 A.2d 526, 533 (1978). However, we have also stated that a single sentence must not be allowed to invalidate a trial justice's charge to the jury when that charge, viewed as a whole, adequately and accurately conveys a proper statement of the law. *State v. Hadrick*, 523 A.2d 441, 444 (R.I.1987). In the present case the trial justice repeatedly admonished the jury that evidence of uncharged crimes allegedly committed by defendant is not admissible to prove that he committed the charged crimes. He emphasized that

"under no circumstances can you use the evidence of the alleged Connecticut robbery to convict the defendant of any of the crimes charged against him in this case. And the same applies with regard to those motor vehicles that he allegedly, along with Mr. Wright, took and left the State with.

"It would be improper for you to convict the defendant of any of the crimes he is accused of in this case on the basis that he may have been involved in other criminal activity unrelated to the charged crimes in this case."

Although we consider the use of the words "criminal disposition" unfortunate, our review of the entire charge convinces us that the trial justice properly instructed the jury on the limited purpose for which evidence of the other crimes was admitted.

## V

### Jury Instructions on Flight

▆▆ The defendant argues that the trial justice's instructions to the jury on flight went beyond the parameters approved by this court in *State v. Cooke*, 479 A.2d 727

(R.I.1984), and constituted an improper comment upon the evidence. He specifically challenges the trial justice's instruction to the jury that evidence of flight is relevant to the issues of accident and of whether defendant had the ability to reason rationally and appreciate the consequences of his actions.

▆▆ In this jurisdiction relevant evidence of flight may be introduced by the prosecution and considered by the jury as a circumstance bearing on the question of a defendant's guilt. *State v. Peabody*, 611 A.2d 826, 834 (R.I.1992); *State v. Cooke*, 479 A.2d at 732. In *Cooke* this court set forth a multi-implication analysis for the jury to consider in determining whether evidence of flight supports the inference of a defendant's consciousness of guilt. 479 A.2d at 732–33. Our examination of the record reveals that the trial justice informed the jury of this analysis, adopting in his charge language consistent with this court's decision in *Cooke*.[6] *Id.* Contrary to the defendant's contention, the trial justice's instructions on flight in no way conveyed to the jury his personal view of the evidence.

We have previously held that flight together with other evidence in the case may be considered by the jury in drawing the inference that a defendant had knowledge that he was fleeing from the specific crime charged. *Cooke*, 479 A.2d at 733. The more immediate in time the flight is to the commission of the charged crime, the stronger the inference that may be drawn of a defendant's consciousness of guilt concerning that offense. *Id.* In the present case defendant fled the state of Rhode Island immediately after shooting and killing Trevor Ramella. Approximately four hours later he committed an armed robbery with the murder weapon. Subsequently defendant was apprehended in

---

6. The trial justice instructed, in pertinent part:
 "In this case, you have also heard evidence regarding the manner and means and the time of the defendant's leaving the Ramella residence after the homicide on November 28th, 1992.
 "As jurors, you may, if you find that the manner and time of his leaving the Ramella residence constitutes flight from the scene of the crime as evidence of consciousness of guilt,

for the homicide, on the part of the defendant, Steven Parkhurst. In determining whether the defendant's leaving the scene of the crime constituted flight therefrom on his part, you should consider the time between the death of Trevor Ramella and the defendant's manner and means of leaving the scene, his intended destination, and whether or not the defendant's reasons for fleeing were related to the death of Trevor Ramella."

the State of Indiana, driving the Ramella's Toyota Celica, and in constructive possession of the murder weapon. The evidence presented by the prosecution therefore supports the inference that defendant recognized the need to flee the scene of the crime and that the need to flee was directly related to the charged offense of murder. We conclude that in the circumstances of this case the trial justice's instructions pertaining to flight were correct and not unduly prejudicial to defendant.

## VI

### Denial of the Motion for a Mistrial

■ The sixth issue defendant raises on appeal concerns the trial justice's denial of his motion to pass the case on the basis that the prosecutor presented testimony at trial that he possessed a wallet and $347 in cash at the time of his arrest. The defendant contends that the probative value this testimony had, if any, to the charges against him was outweighed by the prejudicial effect it had on the jury. The implication, defendant maintains, is that he obtained this money by stealing it from Trevor Ramella or through some other illegal means, notwithstanding the fact that he faced no charge of robbery. In response the prosecutor noted that defense counsel never once requested to preclude the admission of the wallet and the money into evidence despite having known about them since discovery. Defense counsel raised an objection at sidebar when the wallet and the money were marked for identification. The trial justice properly held that the marking for identification did not constitute the basis for any ruling by the court. Defense counsel moved to "pass the case" before these items were admitted as full exhibits. It would appear that his motion was based upon Officer Kevin Gouveia's testimony concerning the wallets of Parkhurst and Wright and their contents. The trial justice concluded that there was no prejudice to defendant and denied the motion to pass the case.

■ A motion to pass the case is viewed by this court as a motion for a mistrial. *State v. LaRoche*, 683 A.2d 989, 999

(R.I.1996). A ruling in regard to a motion for a mistrial lies within the sound discretion of the trial justice. *Id.* Such a determination is entitled to great weight and will not be disturbed by this court on appeal unless the trial justice was clearly wrong. *Kholi*, 672 A.2d at 432. We accord a trial justice's determination great deference because it is he or she "who has a front-row seat at the trial, who is most aware of the circumstances surrounding the actions that have led to the motion for a mistrial, the degree of prejudice to the parties, and the degree of fault each party bears in creating that prejudice." *Gomes*, 690 A.2d at 317–18. In considering a motion for a mistrial, the trial justice should determine whether the evidence was of such a nature to cause the jurors to become so inflamed as to make them unable to decide the case on the basis of the evidence presented. *State v. Mastracchio*, 672 A.2d 438, 444 (R.I.1996). Applying these principles to the present case, we do not find the evidence to be of such a character as to inflame the passions of the jurors to the extent of preventing their calm and dispassionate examination of the evidence. In fact we are of the opinion that no prejudice inured to defendant as a result of evidence relating to the wallet or the money.

Our review of the record reveals that the defendant's wallet was one of many items seized from the defendant and Wright after their arrest in the State of Indiana. Officer Kevin Gouveia of the North Smithfield police department testified at trial to some of the items seized from the defendant and Wright, including their clothing, motor-vehicle registrations, the murder weapon, a .22 caliber bullet, a leather holster, Wright's wallet containing $63 in cash, the defendant's wallet, $347 in cash taken from the defendant's person, and defendant's birth certificate. This testimony followed Officer Gouveia's testimony detailing approximately fifty items collected from the crime scene in North Smithfield, Rhode Island. Such evidence included the victim's teeth, photographs of the victim's body, the barrel of a rifle, broken glass, and pieces of the butt of the rifle. Given the gravity of the evidence found at the crime scene, testimony concerning the defendant's wallet and its contents was unlikely to have inflamed the jurors' passions against him.

The record also supports the conclusion of the trial justice that the defendant was not prejudiced by the officer's testimony concerning the wallet and the cash. In denying the motion to pass the case, the trial justice noted that the sum of money found in the defendant's possession was not excessive, nor was it unusual for an out-of-state traveler to be carrying such a sum. We agree. Since no actual prejudice has been shown, the denial of the motion for mistrial did not constitute error.

For the reasons stated, the defendant's appeal is denied and dismissed. The judgment of conviction is affirmed, and the papers of the case are remanded to the Superior Court.

BOURCIER, J., did not participate.