STATE

v.

Amarilis URENA.

No. 2004-199-C.A.

Supreme Court of Rhode Island.

June 16, 2006.

---

Aaron L. Weisman, Esq., Providence, for Plaintiff.

Paula Lynch, Esq., West Greenwich, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice SUTTELL, for the Court.

The defendant, Amarilis Urena, appeals from a conviction of manslaughter in the stabbing death of her boyfriend after a trial in which she presented evidence concerning battered woman's syndrome. The defendant contends that the trial justice erred in (1) denying her motion for a new trial because the state did not prove beyond a reasonable doubt that she did not act in self-defense, and (2) denying her motion to suppress statements she made to the police. Finding no error in the trial justice's rulings, we affirm the judgment of conviction.

### Facts and Procedural History

On August 26, 2001, defendant fatally stabbed Hector Tavares after a confrontation with him at her friend Javiela Felix's apartment in Providence. At the time, Ms. Urena and Mr. Tavares had been involved in a romantic relationship for nearly a year and lived together in defendant's apartment in Providence. It is uncontroverted that throughout much of their relationship Mr. Tavares was abusive toward defendant. On August 26, 2001, Ms. Urena's fourteen-year-old daughter was visiting her from New York. During the course of the day, Mr. Tavares began drinking beer and proceeded to get drunk. Recognizing that his consumption of alcohol was often a precursor to Tavares's violent behavior, Ms. Urena became fearful that he might abuse her in front of her daughter. She decided, therefore, to take her daughter and spend the night at Ms. Felix's apartment.

During the course of the evening, Mr. Tavares called Ms. Felix's apartment multiple times looking for defendant. The defendant's daughter answered the first several calls and simply hung up on him. Eventually, however, defendant spoke with Mr. Tavares, and it was agreed that he would bring defendant's apartment keys to Ms. Felix's apartment.

When Mr. Tavares arrived at Ms. Felix's apartment, he walked in and threw the set of keys on the coffee table before sitting on the sofa. The defendant's daughter was in Ms. Felix's bedroom talking on the telephone at the time. The defendant sat on a different sofa in the living room, across from Mr. Tavares. Ms. Felix spoke to Mr. Tavares shortly before leaving the living room and going into the bathroom. The defendant testified that she and Mr. Tavares then got into an altercation because she refused to return to her apartment with him.

The defendant testified that the confrontation escalated until she "started to really be very afraid." She said that she was fearful because Mr. Tavares was drinking, and when he drank, "everything changes." She said that she believed "[t]hat as always he was going to beat me up again, and this time in front of my daughter." The defendant said she asked Mr. Tavares "more than five times to please leave," but he would not go. The defendant then went to the kitchen and grabbed a knife, which she said she intended to use "[j]ust to scare him so he [would] just leave." The defendant testified that when she returned from the kitchen to confront Mr. Tavares with the knife, "[a]ll of a sudden," Mr. Tavares "came on top of [her]," and "the knife just went in him."

Ms. Felix testified that when she came out of the bathroom, she saw defendant and Mr. Tavares standing in what appeared to be an embrace. The defendant's daughter was also out of the bedroom, hugging defendant and calling "Mom, Mom, Mom." Ms. Felix said that she then saw defendant pull the knife out of Mr. Tavares's chest. Ms. Felix did not see the knife go into Mr. Tavares. Then, Ms. Felix saw Mr. Tavares silently fall to the

floor and, with her ear to his chest, determined that his heart was not beating as usual. She testified that defendant told her to rinse the knife and throw it away, but that she placed it in the kitchen sink instead. The defendant then called the police.

When the police arrived, defendant, her daughter, and Ms. Felix still were in the apartment. The defendant and Ms. Felix told the police that they did not know the victim's name and that he had stumbled into the apartment bleeding after knocking on the apartment door.[1] The police asked the three females to accompany them to the police station to help further with the investigation, and they agreed. Later, at the police station, defendant changed her story and admitted that she knew Mr. Tavares when the police showed her a document, found on Mr. Tavares, displaying defendant's signature and indicating that a no-contact order between defendant and Mr. Tavares had been terminated.

After admitting that she knew Mr. Tavares, defendant gave a statement to the police in response to their questioning, which was interpreted by a Spanish-speaking officer. She said that Mr. Tavares "was always abusive to her" during their one-year relationship and had been attending domestic violence classes to curb his fits of abuse. Although Mr. Tavares was not physically abusive on the night of the stabbing, defendant asserted that he was intoxicated and "was talking to her aggressively." The defendant said that this was what prompted her to get the knife from the kitchen drawer. She admitted to the police that she "hit him with the knife in the chest area" because his aggressive behavior made her "nervous." Subsequently, on December 7, 2001, a grand jury

charged defendant with the murder of Mr. Tavares.

On January 10, 2003, defendant filed a motion to suppress the statements she made to the Providence police at the station. A trial justice of the Superior Court heard the matter on January 13, 2004. The defendant asserted that the police improperly failed to advise her of her *Miranda*[2] rights when she was being driven from the apartment to the station because the police knew or should have known that she was a suspect. She also argued that she did not make a knowing and voluntary waiver of her rights after she was advised of them later in the evening at the police station. The state presented the testimony of three police officers at the suppression hearing who testified that defendant was not in custody when she was taken to the station. The officers further testified that, before she made her formal statement, defendant was advised of her rights multiple times, indicated that she understood them, and said that she wished to speak to the police anyway.

The trial justice denied defendant's motion to suppress the statements. In so ruling, the trial justice found that defendant was not in custody when the police asked her to accompany them to the station and that she had gone voluntarily. At that time, defendant was not a suspect, but was believed to be one of three witnesses to this incident. In addition, the trial justice found that defendant was also not in custody when she arrived at the police station. He concluded that "anything she said up until the time when the termination of the no contact order was produced was not in any way a product of a custodial setting."

---

1. Although defendant alleged that Ms. Felix told her to create this falsity, Ms. Felix said that the fabrication was defendant's idea.

2. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Once that document was shown to defendant, however, "things changed," and defendant became a suspect in the homicide. Nonetheless, the trial justice found that after defendant saw and acknowledged the document there was "no question" that the officers "admonished [her] of the Miranda Rights and, in fact, they did so on several different occasions." He also found that defendant "certainly understood" those rights, but still "very much wanted to talk to the police." Accordingly, the trial justice denied the motion to suppress and allowed defendant's statement to be admitted at trial.

During the jury trial on the murder charge, the state presented a number of police officers to testify about what they found in the apartment after the stabbing. Dorota Latuszynski, M.D., an assistant medical examiner for the State of Rhode Island, also testified, stating that Mr. Tavares had died from a stab wound that penetrated the upper left side of his chest. She concluded that Mr. Tavares had a blood alcohol level of 0.212 at the time of his death. She further concluded, to a reasonable degree of medical certainty, that "[t]he manner of death was homicide."

Throughout the trial, defendant presented evidence of battered woman's syndrome to support her defense of self-defense. She testified that during her relationship with Mr. Tavares, he would become drunk and beat, choke, and sexually assault her. She said that although he was careful not to leave marks on her he did leave her with black eyes at times. One of the officers who testified at trial acknowledged that Mr. Tavares had been arrested twice for domestic violence. Ms. Felix admitted that although she had never seen the beatings she was aware that Mr. Tavares had assaulted defendant in the past. The defendant also testified that whenever Mr. Tavares got drunk, he would look at her with "weird eyes," and become furious, at which time she would know that he was about to beat her up, as he always did. The defendant said that she was afraid that Mr. Tavares would kill her, and that she knew the signs of the beatings because he would change "just like that."

Other witnesses corroborated the stories of abuse. Nellie Rosario, who owned the beauty salon where defendant worked, testified that she remembered seeing a bruise on defendant's face once and that defendant had called in to be excused from work a "[c]ouple of times" because she said that her boyfriend had beaten her. Another acquaintance of defendant's said that she had seen defendant with two black eyes one time, that defendant had told her Mr. Tavares had beaten her, and that she advised defendant to leave him.

The defense also presented the expert testimony of Evan Stark, a professor of public health at Rutgers University who holds a doctoral degree in sociology. Doctor Stark explained that battered woman's syndrome is a subcategory of post-traumatic-stress disorder. He concluded that defendant was a battered woman for the entirety of her one-year relationship with the victim and that this condition "had a very important bearing on how she perceived, responded to the events on August 26, 2001." Doctor Stark opined that because she had suffered Mr. Tavares's abuse before, defendant was acutely aware of the warning signs that she could perceive just before Mr. Tavares inflicted more physical abuse on her. His expert opinion was that defendant reasonably believed that the only way she could prevent a humiliating beating in front of her daughter at the hands of Mr. Tavares was to grab the knife.

The state offered several rebuttal witnesses. One such witness, Barry Wall, M.D., a psychiatrist and director of forensic services at the Eleanor Slater Hospital

with the Department of Mental Health, agreed with defendant's expert that defendant suffered from battered woman's syndrome. However, Dr. Wall testified that he did not believe that the stabbing "related to" or "was based on" defendant's battered woman's syndrome. Although he thought that the condition may help explain her decision to get the knife to scare Mr. Tavares, he did not think defendant intended to stab him because she had described the incident to Dr. Wall as an accident in which Mr. Tavares had "almost impaled himself." Thus, Dr. Wall concurred in the diagnosis of battered woman's syndrome, but concluded that defendant's act of stabbing Mr. Tavares was not related to her psychiatric condition.

After Dr. Wall's testimony, during an in-chambers, on-the-record conference, the state agreed not to go forward on the murder charge. Both the state and defendant agreed, however, that the jury could receive a charge on the lesser-included offense of manslaughter, and both sides expressed satisfaction with the trial justice's proposed manslaughter charge. In addition, both sides were satisfied with the proposed jury instructions on self-defense, battered woman's syndrome, and accidental death. Defense counsel also indicated that he was withdrawing his pursuit of the *Miranda* issue addressed in the motion to suppress defendant's statement to the police "[w]ith regards to that written statement."

After the in-chambers conference, the state called Ramon Acosta, a friend of the victim's brother, who testified that in May 2001 he heard defendant tell the victim's brother that she had hit Mr. Tavares in the head with a frying pan and that Mr. Tavares's "life was in her hands." Anoth-

er witness of this alleged conversation, Fernando Calcano, who employed Mr. Tavares as a plumber, testified that he heard defendant say that she had hit Mr. Tavares with a frying pan and that, "[t]he next time I will kill him." He also testified that Mr. Tavares would come into work "scratched or with a head injury" and that he would tell Mr. Calcano that "she" hit him.

After the state rested, the trial justice instructed the jury, to which instructions neither side objected. Each side then presented closing arguments. After deliberation, the jury returned a verdict of guilty on the charge of manslaughter. Subsequently, on January 28, 2004, defendant filed a motion for a new trial, alleging that the verdict was against the law and the weight of the evidence. On January 29, 2004, the trial justice heard oral argument on defendant's motion for a new trial, which was denied.

■ On March 23, 2004, defendant was sentenced to thirty years at the Adult Correctional Institutions, with five years to serve and the rest suspended, with probation. The defendant filed a premature notice of appeal on April 1, 2004. Judgment of conviction was entered on May 11, 2004.[3]

### Motion for a New Trial

On appeal, defendant first argues that the trial justice erred in denying her motion for a new trial because the evidence did not prove beyond a reasonable doubt that defendant did not act in self-defense. She contends that the evidence indicated that as a person suffering from battered woman's syndrome, she reasonably believed that she was in imminent danger of

---

**3.** "When a notice of appeal is filed before entry of judgment, this Court treats the appeal as if it had been filed after the entry of judgment." *Dovenmuehle Mortgage, Inc. v. Anto-* *nelli*, 790 A.2d 1113, 1114 n. 1 (R.I.2002). Accordingly, the April 1, 2004 notice of appeal in this case, although filed by defendant prematurely, is valid.

substantial bodily harm when she grabbed the knife to protect herself from Mr. Tavares. She also argues that the trial justice impermissibly shifted the burden of proof to defendant on the issue of self-defense. Although we agree that the state has the burden of proof on self-defense in a criminal trial, we conclude that it is defendant's burden to prove *the existence of* battered woman's syndrome *to support a claim of self-defense.*

■ It is well settled that "[u]nder the law relating to self-defense, one may defend oneself whenever one reasonably believes that he or she is in imminent danger of bodily harm at the hands of another." *State v. D'Amario,* 568 A.2d 1383, 1385 (R.I.1990). One "need not wait for the other to strike the first blow. However, such a person must use only such force as is reasonably necessary for his [or her] own protection." *Id.* Only that degree of force that is necessary to prevent bodily injury will exculpate a defendant, and accordingly, "[o]ne who uses excessive force is held accountable for his or her actions." *Id.* Before resorting to the use of deadly force to defend oneself, a person "must attempt retreat if he or she is consciously aware of an open, safe, and available avenue of escape." *State v. Quarles,* 504 A.2d 473, 475 (R.I.1986).[4] In addition, a defendant who was the initial aggressor of the combative confrontation is generally not entitled to rely on self-defense. *State v. Guillemet,* 430 A.2d 1066, 1068–69 (R.I.1981). Once a defendant introduces evidence of self-defense, the burden is on the state to negate that defense beyond a reasonable doubt. *In re John Doe,* 120 R.I. 732, 742, 390 A.2d 920, 926 (1978). This requirement stems from the protections of the Due Process Clause. *Id.* at 738, 390 A.2d at 924.

■ "[T]he very essence of the defense of self-defense is how the defendant perceived the situation at the time of the incident in question." *D'Amario,* 568 A.2d at 1385 (quoting *State v. Tribble,* 428 A.2d 1079, 1085 (R.I.1981)). A female criminal defendant asserting self-defense may argue that a condition called battered woman's syndrome affected her perception of whether she was in imminent danger and thus needed to defend herself when she acted with force. This Court has recognized battered woman's syndrome as "a mental or an emotional condition that can affect women and * * * have certain legal consequences." *McMaugh v. State,* 612 A.2d 725, 733 (R.I.1992). We also have stated, however, that it is our desire "that a defendant's assertion of the condition be exposed to the most exacting scrutiny to determine its legitimacy in each factual circumstance in which it is presented." *Id.*

■ Accordingly, when battered woman's syndrome is raised as a defense in a criminal trial, the state is not required to disprove it beyond a reasonable doubt, as in other cases in which self-defense is asserted. *McMaugh,* 612 A.2d at 733. "Rather, a defendant [is] required to prove the existence of [battered woman's syndrome] as an affirmative defense by a fair preponderance of the evidence. The defendant must bear the burden to prove the existence of facts that would constitute the battered-woman's-syndrome defense." *Id.* at 733–34. Therefore, in battered woman's syndrome cases, the burden of persuasion is on the defendant to prove by a preponderance of evidence the existence of bat-

---

**4.** "The only exception in Rhode Island to the obligation to attempt retreat was created by statute." *State v. Quarles,* 504 A.2d 473, 475 (R.I.1986). The statute exempts an owner, tenant, or occupier of premises from the duty to retreat and permits that individual to use deadly force against any person engaged in the commission of an unlawful breaking and entering or burglary of the premises. *Id.; see* G.L.1956 § 11–8–8.

tered woman's syndrome and its alleged effect on her perception.

■ In this case under review, the trial justice instructed the jurors on manslaughter, self-defense, and the battered woman's syndrome. With respect to battered woman's syndrome, he said:

"This is one of the very few instances in criminal law that a defendant, not the State, shoulders the burden of proof. Thus, the defendant is not entitled to rely upon her claim of battered woman['s] syndrome unless she initially convinced you by a fair preponderance of the evidence * * * that she was suffering from the effects of battered woman['s] syndrome when Hector Tavares was killed."

It was proper to instruct the jurors that the burden was on defendant to show that she suffered from this condition that ultimately might have affected her perception of the events on August 26, 2001. Moreover, the trial justice went on to instruct the jurors on self-defense, indicating that the question of whether defendant acted in self-defense was separate from the question of whether she suffered from battered woman's syndrome. He explained that a finding that she suffered from battered woman's syndrome could result in a conclusion that defendant reasonably believed herself to be in danger and needed to apply force to defend herself, based upon defendant's altered perception as a result of the condition. The trial justice went on to clarify that even if defendant failed to prove that she was a battered woman, the jurors "should not totally reject her general claim of self-defense if you believe that evidence of self-defense is still present." He added that if the jurors believed that some evidence of self-defense still was present, "the State must prove beyond a reasonable doubt that the defendant did not act in self-defense. In other words, you must acquit the defendant if you have

a reasonable doubt as to whether the defendant acted in self-defense." As in his instruction concerning the burden of proof for the existence of battered woman's syndrome, the trial justice recited the correct burden of proof for self-defense to the jurors. It is therefore clear to us from the record that the trial justice was correct in enunciating both of the burdens of proof.

■ Next, defendant contends that her motion for a new trial should have been granted because the evidence indicated that as a person suffering from battered woman's syndrome she reasonably believed that she was in imminent danger of substantial bodily harm when she grabbed the knife to protect herself from Mr. Tavares. She argues that the trial justice misconceived the evidence because both sides' experts testified that defendant reasonably believed herself to be in imminent danger. The defendant also avers that the trial justice placed undue emphasis on the fact that Mr. Tavares previously had not beaten her at Ms. Felix's apartment or in front of her daughter and that the trial justice misinterpreted her willingness to fight back as demonstrating that she was not a "true" battered woman and thus did not feel the need to act in self-defense.

■ The standard for reviewing a trial court's denial of a motion for a new trial is well established. Pursuant to Rule 33 of the Superior Court Rules of Criminal Procedure, a new trial may be granted on motion of the defendant "if required in the interest of justice." "In deciding a motion for a new trial, the trial justice acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence." *State v. Otero*, 788 A.2d 469, 472 (R.I.2002) (quoting *State v. Banach*, 648 A.2d 1363, 1367 (R.I.1994)). "If, after conducting this independent review, the trial justice agrees with the jury's verdict or if the

evidence is such that reasonable minds could differ as to the outcome, the motion for a new trial should be denied." *Id.* "If, however, 'the trial justice finds that the state has failed to sustain its burden of proof, a new trial must be ordered.'" *Id.* (quoting *State v. Clark,* 603 A.2d 1094, 1096 (R.I.1992)).

In his ruling, "the trial justice need not refer to all the evidence supporting the decision but need only cite evidence sufficient to allow this [C]ourt to discern whether the justice has applied the appropriate standards." *Otero,* 788 A.2d at 472 (quoting *Banach,* 648 A.2d at 1367). "Provided that the trial justice has 'articulated an adequate rationale for denying a motion,' a trial justice's ruling on a new trial motion is entitled to great weight." *State v. Lynch,* 854 A.2d 1022, 1046 (R.I. 2004) (quoting *State v. Rieger,* 763 A.2d 997, 1002 (R.I.2001)). The ruling "will not be overturned unless the trial justice was clearly wrong or unless he or she overlooked or misconceived material and relevant evidence that related to a critical issue in the case." *State v. Bolduc,* 822 A.2d 184, 187 (R.I.2003).

Applying our customary deference to a trial justice's ruling on a motion for a new trial, we reject defendant's assertions. Rather, we are satisfied that the trial justice was not clearly wrong and did not overlook or misconceive material and relevant evidence in denying defendant's motion for a new trial. In so ruling, the trial justice acknowledged that defendant was a battered woman, but he added that, despite this, he did not believe that battered woman's syndrome shielded her from criminal liability under the totality of the circumstances. He said that he was "not convinced that, even through the eyes of a 'reasonable battered woman,' it can be said that Hector Tavares was about to inflict death or serious bodily injury upon" defendant when she decided to grab the knife.

The trial justice noted that even though Mr. Tavares was drunk when he arrived at Ms. Felix's apartment on August 26, 2001 and had beaten defendant while intoxicated in the past, those transgressions had occurred only "in the privacy of their residence, not elsewhere." Indeed, defendant herself acknowledged that Ms. Felix's home was "a safe haven" and that the past abuse never had been inflicted in that apartment or in front of Ms. Felix. In addition, the trial justice found that the presence of defendant's daughter did not heighten defendant's sense of fear, but rather diminished it because defendant conceded that Mr. Tavares never assaulted her while her daughter was around. Accordingly, the trial justice concluded, as the jurors apparently had, that defendant's belief that she was in imminent danger on August 26, 2001 was unreasonable even in light of the evidence that she was a victim of Mr. Tavares's past abuse. We are not convinced that consideration of these facts was clearly erroneous, as defendant contends, because the trial justice considered these facts to assess defendant's credibility concerning her alleged perception that she was in danger and had to defend herself from Mr. Tavares on the night in question. The trial justice did not err in considering the totality of the circumstances presented to him that were relevant to the material issue in this case of whether defendant acted in self-defense.

Moreover, the trial justice noted that the evidence at trial indicated that defendant had been physically abusive to Mr. Tavares in the past as well, once striking him in the head with a frying pan and on another occasion stating that she would kill him if he ever hit her again. The trial justice also recounted evidence that defendant once had attempted to stop police from arresting Mr. Tavares after she had reported an allegation of abuse, necessitating the use of pepper spray "to deter her

from furthering her obstructive and obstreperous conduct." Ultimately, the trial justice decided that defendant could not claim self-defense because she instigated the confrontation on August 26, 2001 by introducing "a dangerous weapon into the mix" and brandishing the knife over Mr. Tavares. He remarked that defendant "purposefully went to the kitchen and rummaged through three kitchen drawers before she selected a knife to her liking with which she armed herself." He further noted that "those are factors that reflect the element of premeditation that is integral to a murder charge, much less manslaughter."

The trial justice also observed that defendant's continuous lies to the police were circumstantial evidence of a consciousness of guilt, having independent probative force, that belied her theory of self-defense. Finally, he rejected defendant's alternative defense that the death was accidental. Noting that the jury had the right to either accept or reject defendant's exculpatory assertions and that there was "ample other evidence to sustain the jury's conclusion beyond a reasonable doubt that the defendant was easily guilty of manslaughter," he denied the motion for a new trial.

We conclude that these specific findings by the trial justice show that he exercised the appropriate independent judgment on the credibility of the witnesses and the weight of the evidence. *See Otero,* 788 A.2d at 472. In addition, the trial justice articulated adequate reasons for denying the new trial motion, causing us to give his ruling great weight. *See Lynch,* 854 A.2d at 1046. The main issue in this case was whether defendant should have been exonerated because she acted in self-defense. The trial justice did not overlook or misconceive material and relevant evidence on self-defense; rather, he specifically referred to the evidence that defendant presented on both self-defense and the battered woman's syndrome and assessed this evidence independently and in light of the evidence offered by the state to conclude that the jury's verdict was sustainable.

## Motion to Suppress

The defendant's second argument on appeal is that the trial justice erred in denying her motion to suppress certain statements that she made to the police. The state asserts that defendant has waived this argument on appeal because her counsel failed to object to the police statement's admission in either transcription or taped form at trial.

The defendant makes a threefold argument that the police took statements in violation of her constitutional rights. First, defendant argues that she was in custody when the police took her to the station, and therefore the police immediately should have advised her of the *Miranda* rights, rather than wait until after showing her the termination of the no-contact order. Second, she avers that even if we found that she was not in custody upon first arriving at the station, her status changed and she was in custody once the police discovered the existence of the termination of the no-contact order. Third, defendant argues that she did not knowingly or voluntarily waive her *Miranda* rights and that the tape-recorded statement to the police demonstrates that she did not fully understand her rights.

It is clear to us from a review of the record that defendant has expressly waived such a constitutional challenge to the admissibility of her statements to the Providence police. When the state moved that both the audio tape memorializing her oral statements and a transcript of the recording be marked as full exhibits, defendant's counsel responded, "[n]o objection." Then later, during an in-chambers conference, counsel affirmatively stated

that defendant was withdrawing and waiving the Fifth Amendment *Miranda* issue "[w]ith regards to that written statement." The trial justice responded: "My understanding is that any pretrial motions to suppress her statements pursuant to *Miranda* are no longer part of this case and are not to be submitted to the jury and that issue is no longer part of the case. Am I correct?" To this, defendant's counsel replied: "I told Your Honor that I was not going to request an instruction for *Miranda* that is usually given to a jury, that boiler plate instruction about them finding whether or not the defendant * * * was advised of the *Miranda* rights; she knew and voluntarily waived those rights."

■ This Court recently has said that a defendant's acquiescence in the decision of a trial justice on an issue and the failure to argue the issue results in a waiver of the issue on appeal to this Court. *State v. Stierhoff,* 879 A.2d 425, 434 (R.I. 2005). Here, not only did the defendant acquiesce in the admission of her statements into evidence, but also she expressly waived on the record her constitutional challenge to the denial of her motion to suppress such statements. She has, therefore, failed to preserve the issue for appellate review.[5]

## Conclusion

For the reasons stated herein, we affirm the judgment of conviction and remand the record of this case to the Superior Court.

---

**5.** Even if the issue had been preserved adequately, we are satisfied that it lacks merit. The record amply supports the trial justice's finding that defendant was neither a suspect nor in custody when she was driven to the police station in a police car with her daughter and Ms. Felix. *See, e.g., State v. Aponte,* 800 A.2d 420, 425–26 (R.I.2002); *State v. Kryla,* 742 A.2d 1178, 1181–82 (R.I.1999); *State v. Diaz,* 654 A.2d 1195, 1204–05 (R.I. 1995); *State v. Kennedy,* 569 A.2d 4, 7 (R.I. 1990). Further, she was not a suspect until the document reflecting the termination of the no-contact order was discovered and she acknowledged her signature on the order, at which point the questioning ceased. An officer then "assiduously admonished this woman of her rights in Spanish, her native language and his." Only after she had been read her rights and indicated that she understood them did she change her fabricated story that an unknown man had fallen into the apartment already stabbed. Moreover, she was advised of her rights in Spanish three more times before she gave a tape-recorded statement. We are well satisfied that the trial justice properly denied the motion to suppress.