**Supreme Court**

No. 2012-159-Appeal.
(11-831-1)

In re J.S.                              :

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

In re J.S.                                    :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Robinson, for the Court.**  The juvenile respondent, J.S.,[1] appeals from a judgment entered by the Family Court finding him delinquent for committing an assault with a dangerous weapon.  This case came before the Supreme Court pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided.  After a close review of the record and careful consideration of the parties' arguments (both written and oral), we are satisfied that cause has not been shown and that this appeal may be decided at this time.  For the reasons set forth in this opinion, we affirm the judgment of the Family Court.

## I

### Facts and Travel

On May 5, 2011, respondent injured the complaining witness, James Paschal, with a knife, while both were in attendance at a church-affiliated "camporee"[2] at Burlingame State Park

---

[1]  This Court granted respondent's motion requesting that, for the purposes of this appeal, we use pseudonyms in referring to him (J.S.) and his sister (M.S.).

[2]  The word "camporee" (created by combining "camp" and "jamboree") was initially coined to refer to a gathering of Boy Scouts or Girl Scouts.  See The American Heritage Dictionary of the English Language 269 (5th ed. 2011).  Subsequently, the word has been applied to analogous gatherings by other affinity groups.

in Charlestown. The Rhode Island State Police filed two petitions in Family Court against respondent in connection with that incident: (1) a petition alleging that respondent was wayward due to having committed an offense that, if committed by an adult, would constitute the misdemeanor offense of carrying a concealed knife with a blade over three inches in length, in violation of G.L. 1956 § 11-47-42(a)(1);[3] and (2) a petition alleging that respondent was delinquent due to having committed an offense that, if committed by an adult, would constitute an assault with a dangerous weapon, in violation of G.L. 1956 § 11-5-2. A trial was held before a justice of the Family Court in October and November of 2011. We summarize below the salient aspects of what transpired at that trial.

**A**

**The Testimony of James Paschal**

The complaining witness, James Paschal, was the first witness to testify. It was his testimony that he had previously been engaged to respondent's older sister (M.S.) and that, while they were engaged, he had lived with M.S.'s family and shared a room with respondent.

Mr. Paschal testified that, on May 5, 2011, he was working as a counselor at the above-referenced camporee. He further testified that, at approximately 11:15 p.m. on that date, he and M.S. and an attendee of the camporee named Aldwyn Montaque were searching for respondent, who had stayed out past the time of curfew. Mr. Paschal stated that, when they found respondent near one of the camp's outbuildings, M.S. asked him to return her cell phone (which she had previously lent to him). He said that respondent proceeded to hold the cell phone above his head while M.S. tried to jump up in an attempt to get it out of her brother's hand. It was Mr. Paschal's

---

[3] In a bench decision rendered on December 16, 2011, the trial justice found that the state had failed to prove that respondent had carried a concealed knife with a blade over three inches; accordingly, he ruled that respondent was not wayward.

testimony that an altercation between M.S. and respondent ensued, during which respondent "elbowed [M.S.] in the face," causing her to fall and hit the ground. Mr. Paschal testified that he then intervened by grabbing respondent from behind and pulling him away from M.S. On cross-examination, Mr. Paschal acknowledged that he had "initiated the first physical contact" with respondent. He further testified that, when he let respondent go, respondent punched him in the face and "busted [his] bottom lip." He stated that he then "put [respondent] on the ground" so that respondent was lying on his stomach; and he added that, at that point, he was "kind of on top [of respondent and] behind him."

According to Mr. Paschal's testimony, respondent said: "Get off me," "I have a knife;" Mr. Paschal added that he felt a knife when he reached for respondent's hand. He stated that thereafter M.S. came over and tried to take the knife out of respondent's hand and that respondent "end[ed] up cutting her." Mr. Paschal further testified that respondent "started slashing at [him]" and that he "felt something hit [him] in [the] head;" he added that, although he tried to disarm respondent, he was unable to do so. It was Mr. Paschal's further testimony that, when he "released a little pressure" on respondent, respondent turned him over and was on top of him. He proceeded to testify, however, that he was able to "flip" respondent over, so that respondent was once again underneath him at which point respondent was pointing the knife at Mr. Paschal's neck and was trying to push it in. He stated that, because blood from one of the cuts on his face that had been inflicted by the knife was blurring his vision and he feared that he "would be in big trouble" if he could not see, he hit respondent twice "in the head." He added that, as a result, respondent stopped struggling. It was further Mr. Paschal's testimony that, thereafter, campground security and the police arrived. When Mr. Paschal was asked whether,

"other than the two hits on the back of his head," he attempted to strike respondent in any way, he answered in the negative.

**B**

**The Testimony of Aldwyn Montaque**

Aldwyn Montaque, who was sixteen years old at the time of trial, testified next. He stated that, on the night at issue, he assisted Mr. Paschal and M.S. in their search for respondent. He testified that, when the trio found respondent near one of the camp's outbuildings, M.S. and respondent proceeded to argue about her cell phone, which he said respondent would not return to her; he added that he saw respondent hit M.S. "[i]n the face" with the palm of his hand but that M.S. did not fall to the ground as a result of the blow. He further testified that respondent then began to run while being pursued by Mr. Paschal, who "tackled him to the ground." According to Mr. Montaque's testimony, Mr. Paschal was sitting on respondent's back and said to respondent: "[I]f you pull your knife out on me, I will hit you." He stated that respondent then pulled out his knife and "started wrestling [and] fighting" with Mr. Paschal. Mr. Montaque initially testified that Mr. Paschal "hit [respondent] because the knife was out;" however, when Mr. Montaque was asked by the trial justice, after the prosecutor's redirect examination, how he knew that to be true, he responded: "I don't exactly know that." He further testified that, while he and M.S. were urging the two men to stop fighting, he saw Mr. Paschal hitting respondent, who was "shoving, like mad, * * * trying to cut him." He stated that M.S. was trying to pull the two combatants apart when respondent "accidentally cut" her hand. Mr. Montaque stated that Mr. Paschal pinned respondent down, while he (Mr. Montaque) ran to alert security about what was happening.

## C

## The Testimony of Brenda Kruger

Brenda Kruger, a staff member at the camporee, was called by the defense. She stated that, on the night in question, she was in her tent when she heard a male voice repeatedly yelling: "Get off of me." She further stated that she walked toward the source of the "commotion," at which point she observed a male lying on the ground with another male on top of him. Ms. Kruger testified that she saw the "person on top punch the person on the bottom;" she added that she saw the arm of the male on top "go up and down twice" and then "go up and down twice again." It was Ms. Kruger's testimony that, when she turned around so that she might "go get help," she heard the words "blood" and "knife." She added that she had "heard enough that [she] knew a knife had come out."

## D

## The Testimony of M.S.

The respondent's sister, M.S., was also called by the defense. She testified that, on the night of May 5, 2011, while she was working as a counselor at the camporee, Mr. Paschal, Mr. Montaque, and she searched for and found her brother near one of the camp's outbuildings. She added that, after she asked respondent to return her cell phone, he moved it out of her range and asked her to wait. M.S. testified that, in response, she "grabbed him by his ear and slapped him on the side of his face," at which point respondent pushed her off with his arm. According to her testimony, Mr. Paschal then grabbed respondent "around his front from behind" and told him not to hit his sister. It was her further testimony that respondent tried to get away from Mr. Paschal but that Mr. Paschal threw him to the ground. She testified that, at that point, Mr. Paschal was

on top of respondent, who was lying face down on the ground; she added that Mr. Paschal was demanding that respondent give him the cell phone.

In M.S.'s estimation, Mr. Paschal's behavior was "becoming violent * * * and forceful." She stated that Mr. Paschal began choking respondent and "saying threatening things." She further stated that, because she had become "extremely concerned," she said to Mr. Paschal: "Are you trying to kill him?" She testified that Mr. Paschal replied that respondent had a knife; she added that Mr. Paschal said: "I'm from the street. I know how to choke people who pull knives on people." She further testified, however, that she did not see respondent holding a knife until after Mr. Paschal "started hitting [respondent] or * * * knocking his head against the ground."

It was M.S.'s further testimony that she then saw blood but that she was not sure where it was coming from—although she stated that Mr. Paschal said that respondent was "stabbing" him. She testified that, at that point, Mr. Paschal was "punching [respondent] and hitting him in the head." According to her testimony, she did not see respondent cut Mr. Paschal, but she added that she thought that Mr. Paschal "was being very aggressive and unnecessarily so" since he was "significantly larger" than respondent;[4] she added that, in her opinion, Mr. Paschal could "easily" have overpowered respondent and "de-escalated the situation by just immobilizing him."

---

[4] Mr. Paschal testified that, at the time of the incident, he was six feet tall and weighed approximately one hundred and seventy pounds. The respondent testified that, at the time of the incident, he was five feet eight inches tall and weighed approximately one hundred and twenty-five pounds.

# E

## The Testimony of Respondent

The respondent, who was fifteen years old at the time of trial, testified in his own defense. He testified that, earlier on the night in question, he had borrowed M.S.'s cell phone and that, when she asked him to return it, a struggle ensued. He stated that, after M.S. tried to take her cell phone from him, he told her to "just wait" and that he "pushed her off." He further stated that Mr. Paschal, who he said was also present, then "grabbed him from behind * * * in a restraint position" and stated: "[Y]ou don't hit your sister." The respondent stated that Mr. Paschal asked him for M.S.'s cell phone and that he responded by telling Mr. Paschal to wait; he added that, instead, Mr. Paschal "threw [him] on the ground" so that he ended up face down on the ground with Mr. Paschal on top of him. He testified that Mr. Paschal then proceeded to "try[] to take the phone." According to respondent's testimony, Mr. Paschal "started to become a little more forceful in trying to take the phone;" he added, however, that, at that point, Mr. Paschal was not hurting him.

The respondent further stated that, after he and Mr. Paschal struggled "for a little bit," Mr. Paschal began holding him down "more forcefully" and that, at that point, he told Mr. Paschal "to get off of [him]." It was his testimony that Mr. Paschal then started choking him by placing his arm around his neck, which "restrict[ed] [his] breathing majorly." He testified that he was "kind of shocked" and that he told Mr. Paschal that he could not breathe and asked him: "Are you going to kill me?" He stated that he heard Mr. Paschal say "something about a knife"—although he said that, at that time, his knife was still in his pocket. It was his further testimony that Mr. Paschal said, "Don't pull your knife on me" and also said that he was "from the streets." The respondent testified that, at that point, he was "really scared;" he explained that

- 7 -

what caused him to be "really scared" was the just-quoted comment by Mr. Paschal, which respondent said reminded him of the violent acts that Mr. Paschal had previously told him about having committed.

The respondent testified that Mr. Paschal then started punching him. He described his own state of mind as follows:

> "I had no clue why he would want to knock me out. I felt like he was going to break my neck or something like that, so I felt the only way I could * * * look out for my own safety * * * was to do something, the last resort I had was the knife on me. If I pulled it out and held it to him and still kept saying 'get off of me,' maybe he would take that seriously and move for his own good, so that's what I did."

He testified that, even though he held the knife to Mr. Paschal's side and told him to "get off of [him]," Mr. Paschal continued punching him, stating that he was "not getting off of him." He further testified that, as a result of being struck by Mr. Paschal, he was "kind of exhausted and * * * dizzy" and was "pretty terrified." The respondent stated that M.S. told Mr. Paschal to "get off of" him and that she tried to grab the knife; he added, however, that he did not give his sister the knife because he "didn't know what [Mr. Paschal] was going to do."

The respondent stated that he then held the knife to the back of Mr. Paschal's neck— although he denied "try[ing] to" or "intend[ing] to cut" him. He additionally testified that he recalled Mr. Paschal, M.S., and Mr. Montaque talking about blood, but he said that he "couldn't see what was happening" or "where the blood was." He stated that, when he realized that the knife had not "worked to de-escalate the situation at all," he stopped struggling.

The respondent testified that, at some point prior to the May 5 incident, Mr. Paschal had spoken to him about "how he was in a gang" and had told him that he "was a leader in the gang to some degree;" he added that Mr. Paschal had told him that he "carried a gun" or "had a gun."

He further testified that Mr. Paschal had specifically told him about an occasion when "he and another one of his friends had taken this guy, cornered him in a bathroom * * * and they beat him up and broke his ribs."[5]  He stated, however, that he had never seen Mr. Paschal act violently prior to the May 5 incident and that he "didn't think of [Mr. Paschal] as a violent person;" he further stated that he was surprised and shocked by Mr. Paschal's behavior on May 5.

**F**

**The Adjudication of Delinquency**

On December 16, 2011, the trial justice found that the state had proven beyond a reasonable doubt that respondent committed an assault with a dangerous weapon, and he adjudicated him delinquent with respect to that offense.  In due course, the trial justice placed respondent on probation "until further order of the court" and ordered him: (1) "to cooperate with anger management * * * [and] family counseling;" (2) to send a written apology to the complainant; and (3) to perform fifty hours of community service.  The respondent filed a timely notice of appeal.

On appeal, respondent contends that the trial justice was clearly wrong "in deciding that the state had disproved [his defense of] self-defense beyond a reasonable doubt."

**II**

**Standard of Review**

In reviewing findings of fact by a trial justice in a delinquency adjudication, we apply a deferential standard of review.  In re Richard A., 946 A.2d 204, 209 (R.I. 2008); In re Ryan B.,

---

[5]     On cross-examination, Mr. Paschal conceded that he had previously been a member of a gang and that he had disclosed that fact to respondent and his family; however, he denied telling respondent that he used to carry a gun or mentioning an incident in which he "broke someone's ribs in a bathroom."

739 A.2d 232, 235 (R.I. 1999). On appeal, this Court reviews the record "to determine therefrom whether legally competent evidence exists therein to support the findings made by the Family Court trial justice." In re Malik D., 730 A.2d 1070, 1072 (R.I. 1999); see also In re Miguel A., 990 A.2d 1216, 1220 (R.I. 2010). This Court has stated that, in view of our substantial deference to the findings of a trial justice sitting without a jury, we "will not disturb those findings unless the trial justice has overlooked or misconceived material evidence or was otherwise clearly wrong." In re Richard A., 946 A.2d at 209; see also In re David G., 741 A.2d 863, 865 (R.I. 1999).

### III

### Analysis

Because the central issue on appeal is whether the state presented sufficient evidence to disprove respondent's claim of self-defense beyond a reasonable doubt, we begin our analysis by briefly summarizing the law in this jurisdiction regarding the defense of self-defense. This Court has articulated the legal principles with respect to the defense of self-defense as follows:

> "Under the law relating to self-defense, one may defend oneself whenever one reasonably believes that he or she is in imminent danger of bodily harm at the hands of another. Such a person, having the fear, need not wait for the other to strike the first blow. However, such a person must use only such force as is reasonably necessary for his own protection. The permissible degree of force used in defense of oneself varies with the particular set of circumstances in which he or she acts, but in no set of circumstances may one apply more than that degree of force necessary to prevent bodily injury." State v. Linde, 876 A.2d 1115, 1129 (R.I. 2005) (internal quotation marks omitted); see also State v. D'Amario, 568 A.2d 1383, 1385 (R.I. 1990).

Prior to resorting to the use of deadly force to protect oneself, however, one "must attempt to retreat if [he or she is] consciously aware of an open, safe and available avenue of escape." State v. Silvia, 836 A.2d 197, 200 (R.I. 2003) (internal quotation marks omitted); see

- 10 -

also State v. Urena, 899 A.2d 1281, 1288 (R.I. 2006). In addition, "one may not invoke the doctrine of self-defense if he or she has instigated the combative confrontation." State v. Pineda, 13 A.3d 623, 631 (R.I. 2011) (internal quotation marks omitted); see also State v. Martinez, 652 A.2d 958, 961 (R.I. 1995). This Court has stated that the "very essence of the defense of self-defense is how the defendant perceived the situation at the time of the incident in question." Urena, 899 A.2d at 1288 (internal quotation marks omitted). When determining whether a defendant's actions were lawful in this context, we have recognized that a consideration of factors such as his or her physical condition or youth may be appropriate. See State v. Fetzik, 577 A.2d 990, 993, 994 (R.I. 1990); In re Paul F., 543 A.2d 255, 257, 258 (R.I. 1988). Furthermore, "[i]t is well settled that a defendant who contends that he or she acted in self-defense is entitled to present evidence that the victim had a reputation for being violent in order to show that the defendant's fear of injury was reasonable or to show that the victim was the aggressor." State v. Cotty, 899 A.2d 482, 494 (R.I. 2006); see, e.g., State v. Ventre, 811 A.2d 1178, 1182 (R.I. 2002); State v. Soto, 477 A.2d 945, 949 (R.I. 1984). "Once a defendant has satisfied the burden of presenting sufficient evidence to raise the issue of whether he or she [acted] in self-defense, it becomes the state's burden to disprove it beyond a reasonable doubt." State v. Lopez, 943 A.2d 1035, 1045 (R.I. 2008) (internal quotation marks omitted); see also State v. Hallenbeck, 878 A.2d 992, 1012 (R.I. 2005).

Bearing in mind these principles relative to self-defense, we turn next to the trial justice's findings in his bench decision, several of which respondent challenges on appeal. The trial justice found that the "believable, credible evidence" proved that respondent could "clearly" have ended the confrontation between Mr. Paschal and him by returning his sister's cell phone but that, "in a rush of either testosterone or stubbornness, he struggled with the bigger and older

[Mr. Paschal] rather than surrender the cherished media device." The trial justice credited the testimony of Mr. Paschal with respect to that confrontation, stating that "the believable, credible evidence" indicated that Mr. Paschal "just held [respondent] down and * * * did not choke him or punch him until the knife was pulled." In contrast, the trial justice chose to reject certain aspects of respondent's testimony; he found respondent's testimony that he accidentally cut Mr. Paschal to be "totally lacking in credibility," and he found that respondent had "intentionally inflicted [Mr. Paschal's] wounds by slashing at him with the knife." Additionally, the trial justice found that respondent "admit[ted] that he was not afraid * * * of" Mr. Paschal because, despite being aware of at least one prior incident of violence allegedly perpetrated by Mr. Paschal, respondent testified that he "did not consider [him] to be a violent person."

It was the trial justice's opinion that "the believable, credible evidence proves beyond a reasonable doubt that [respondent] did not believe he was in imminent danger of bodily harm." He noted that the camporee was actually a church outing, where help was readily available. He also noted that respondent was not threatened with deadly force at any point on the night in question, "yet [he] utilized [deadly force] in a juvenile attempt to win the dispute." The trial justice stated that, in his view, respondent had pulled out the knife "as a means of getting his way, not defending himself." He concluded that respondent had utilized excessive force in attempting to repel Mr. Paschal and that respondent's use of deadly force was not justified under the law of self-defense.

Based on a careful review of the record, it is our judgment that there was sufficient legally competent evidence to support the trial justice's finding that the state disproved beyond a reasonable doubt respondent's defense of self-defense and the trial justice's adjudication of respondent as delinquent for having committed an assault with a dangerous weapon. It is true

- 12 -

that respondent, whose testimony was corroborated by that of his sister, testified that Mr. Paschal was punching and choking him when he pulled out the knife. But the record also contains Mr. Paschal's testimony that, although he had been restraining respondent, he did not hit respondent until after respondent had injured him with the knife. Mr. Paschal's testimony was not contradicted by the testimony of either Mr. Montaque or Ms. Kruger. Thus, the testimony elicited at trial could justifiably be viewed by the trier of fact as indicating that Mr. Paschal was attempting to hold respondent down in order to immobilize him rather than with the intent to cause him injury. In our opinion, the state introduced sufficient evidence to prove beyond a reasonable doubt that respondent, by cutting Mr. Paschal with a knife, used an amount of force beyond that "degree of force that is necessary to prevent bodily injury" under the attendant circumstances—and, as we have previously stated: "One who uses excessive force is [to be] held accountable for his or her actions." Urena, 899 A.2d at 1288.

On appeal, respondent contends that "[t]he trial justice was clearly wrong in deciding that the state had disproved self-defense beyond a reasonable doubt." The respondent specifically contends that the trial justice misconceived or overlooked material evidence in making the following findings: (1) that respondent could have ended the matter "by just giving [the phone] back;" (2) that the camporee "was a church outing where help was readily available;" (3) that respondent did not fear Mr. Paschal due to the fact that he had a positive relationship with him and did not regard him as a violent person; (4) that Mr. Paschal did not choke or punch respondent until the knife was pulled; and (5) that respondent used deadly force "in a juvenile attempt to win a dispute." All of these challenged findings, however, were either not material to the trial justice's determination that respondent's use of deadly force was unreasonable or were supported by what the trial justice found to be the credible evidence adduced at trial. Given the

deferential standard of review that this Court affords to the findings of a trial justice sitting without a jury in a delinquency adjudication, we are unable to conclude that the trial justice overlooked or misconceived material evidence or was otherwise clearly wrong with respect to his findings or his conclusion that respondent did not act in justifiable self-defense during the incident at issue. In our view, respondent's appeal is primarily a challenge to the trial justice's assessment of the credibility of certain witnesses—namely, Mr. Paschal and respondent. But, as we have stated before: "This Court consistently has held that factual findings of a trial justice sitting without a jury are granted an extremely deferential standard of review." State v. Gianquitti, 22 A.3d 1161, 1165 (R.I. 2011); see also State v. Jensen, 40 A.3d 771, 780, 781 (R.I. 2012); State v. DiCarlo, 987 A.2d 867, 872 (R.I. 2010).

Having closely scrutinized the record and bearing in mind the well-settled principles that govern our review in this context, we perceive no reason to disturb the ruling of the Family Court.

## IV

## Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Family Court. The record in this case may be remanded to that tribunal.



# RHODE ISLAND SUPREME COURT CLERK'S OFFICE

## *Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**    In re J.S.

**CASE NO:**    No. 2012-159-Appeal.
(11-831-1)

**COURT:**    Supreme Court

**DATE OPINION FILED:**  June 9, 2014

**JUSTICES:**    Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**    Associate Justice William P. Robinson III

**SOURCE OF APPEAL:**    Providence County Family Court

**JUDGE FROM LOWER COURT**:

    Associate Justice Michael B. Forte

**ATTORNEYS ON APPEAL:**

    For Respondent:  Catherine Gibran
                 Office of the Public Defender

    For State:  Christopher R. Bush
               Department of Attorney General